CLAUDE S. KIDD, JR., THOMAS H. COLLINS, AND DAVID P. DILLARD v. C. F. EARLY AND WIFE, BESSIE D. EARLY

No. 69

(Filed 2 March 1976)

1. **Vendor and Purchaser § 1— option — contract to convey — specific performance**

    An option is transformed into a contract to convey upon acceptance by the optionee in accordance with its terms and is then specifically enforceable if it is otherwise a proper subject for equitable relief.

2. **Vendor and Purchaser § 3— contract to convey — description of land**

    A valid contract to convey land must contain, expressly or by necessary implication, all the essential features of an agreement to sell, one of which is a description of the land, certain in itself or capable of being rendered certain by reference to an extrinsic source designated therein. G.S. 22-2.

3. **Frauds, Statute of § 6; Boundaries § 10— description — patent or latent ambiguity**

    When a description leaves the land in a state of absolute uncertainty, and refers to nothing extrinsic by which it might be identified with certainty, it is patently ambiguous and parol evidence is not admissible to aid the description; a description is latently ambiguous if it is insufficient in itself to identify the property but refers to something extrinsic by which identification might possibly be made.

Kidd v. Early

4. **Vendor and Purchaser § 3— contract to convey part of tract — description**

A contract to convey a part of a tract of land, to be valid, must definitely identify the portion to be conveyed or designate the means or source by which it can be positively identified.

5. **Vendor and Purchaser § 3— contract to convey — exception of part of land described**

A contract to convey, excepting a part of the land described, is valid provided the land excepted can be identified.

6. **Vendor and Purchaser § 3— option — sale of portion of tract — description — latent ambiguity**

A contract to convey 200 acres of a larger tract described as "the C. F. Early Farm" is saved from patent ambiguity by the further contract provision that the acreage is "to be determined by a new survey furnished by the sellers," and latent ambiguity in the description was removed when a survey was made showing the portion to be retained by the sellers.

7. **Vendor and Purchaser § 1— option to purchase — implied method of payment**

When an option to purchase real estate neither specifies the method of payment nor provides that the terms are to be fixed by a later agreement, the law implies that the purchase price will be paid in cash.

8. **Vendor and Purchaser § 2— option contract — effect of subsequent negotiations**

Since an option is a binding contract, it is not revocable by the optionor within the stated period, and subsequent negotiations which do not result in an agreement to vary the terms of the option will not constitute a rejection of it; therefore, an optionee did not invalidate his option by making a counter offer during the option period concerning the terms of payment.

9. **Vendor and Purchaser § 2— exercise of option — necessity for tender of payment**

Whether tender of the purchase price is necessary to exercise an option depends upon the agreement of the parties as expressed in the particular instrument.

10. **Vendor and Purchaser § 2— exercise of option — necessity for tender of payment**

Where the option requires the payment of the purchase money or a part thereof to accompany the optionee's election to exercise the option, tender of the payment specified is a condition precedent to the formation of a contract to sell unless it is waived by the optionor; on the other hand, the option may merely require that notice be given of the exercise thereof during the term of the option.

11. **Vendor and Purchaser § 2— exercise of option — tender of purchase price not required**

Tender of the purchase price was not a prerequisite to the exercise of an option in which the optionors agreed to convey to optionees,

Kidd v. Early

upon demand within 30 days from the date of the option, a deed to the described premises upon payment of $600 per acre (acreage to be determined by survey furnished by sellers), with optionees to be credited with consideration paid for the option and to "have reasonable additional time for title examination," since (1) optionees could not know the acreage and full purchase price until the optionors provided the optionees with the survey they agreed to furnish, and (2) the import of the language referring to additional time for title examination is to give the optionees such additional time before they would be required to pay for the land.

12. **Vendor and Purchaser § 2— option — notice of noncompliance by optionor — necessity for tender of payment**

Notice from the optionors that they would not carry out the terms of the option made unnecessary a tender of payment by the optionees.

13. **Rules of Civil Procedure § 56— summary judgment upon affidavits of movant**

Summary judgment may be granted for a party with the burden of proof on the basis of his own affidavits (1) when there are only latent doubts as to the affiant's credibility; (2) when the opposing party has failed to introduce any materials supporting his opposition, failed to point to specific areas of impeachment and contradiction, and failed to utilize Rule 56(f); and (3) when summary judgment is otherwise appropriate.

14. **Vendor and Purchaser § 5— option contract — specific performance — summary judgment in favor of purchasers**

There was no genuine issue of fact as to whether plaintiff purchasers were ready, willing and able to perform their part of an option-contract, and summary judgment against defendant sellers decreeing specific performance of the option-contract was appropriate, where plaintiffs' affidavits and supporting materials, if true, establish that upon tender of the deed, they were ready, willing, and able to pay defendants cash for the property; there are only latent doubts as to the credibility of these affidavits stemming from the fact that plaintiffs are interested parties; defendants have not produced any contradictory affidavits, have not pointed to any specific grounds for impeachment, and have not utilized Rule 56(f) to show why they could not justify their opposition to plaintiffs' motion; and the affidavit of a disinterested bank president strongly corroborates plaintiffs' affidavits and financial statements and tends to show that plaintiffs were able to perform.

ON plaintiff's petition for certiorari and defendants' appeal of right under G.S. 7A-30(2) to review the Court of Appeals' decision, 23 N.C. App. 129, 208 S.E. 2d 511 (1974), which affirmed the denial of plaintiffs' motion for summary judgment and reversed summary judgment in defendants' favor entered by *Lupton, J.*, at the 22 April 1974 Session of GUILFORD Superior Court, docketed and argued as Case No. 45 at the Spring Term 1975.

Action to enforce specific performance of a contract (option) to convey real property.

After the pleadings were filed on 4 December 1972 defendants submitted to plaintiff Kidd (Dr. Kidd) 19 interrogatories, which he answered on 29 December 1972. Thereafter plaintiffs took the deposition of defendant C. F. Early (Early), which was filed on 2 April 1973. Defendants moved for summary judgment on 31 October 1973. Plaintiffs moved for summary judgment on 8 November 1973 and filed affidavits in support of their motion. The pleadings, exhibits, Dr. Kidd's answers to the interrogatories, defendants' deposition, and the affidavit filed by plaintiffs are summarized below.

On 27 July 1972, by an "Exclusive Listing Contract," defendants gave Granger Westbrook, a real estate agent, the exclusive right for three months to sell "two hundred acres more or less" of defendants' farmland in Guilford County. The price specified was $600 per acre "on terms of all cash [to defendants] or upon such other terms and conditions as may be agreed upon later." The acreage was "to be verified by survey to qualified purchaser by sellers."

On 4 August 1972, in consideration of $500, defendants gave to Dr. Kidd, one of the plaintiffs in this action, and Mr. Howard Coble a thirty-day option to purchase the property. "The purchasers were given the privilege of renewal for an additional 30 days upon the payment of an additional $500.00."

On 1 September 1972, in consideration of $500, defendants renewed the first option by the execution of a second, the terms of which are practically identical with the first. The second, like the first, was executed on a printed form supplied by Westbrook. It is in form, words and figures as follows:

"OPTION
9-1-72

NORTH CAROLINA
Guilford County

In consideration of the sum of Five Hundred Dollars ($500.00) to us in hand paid this day by Howard Coble & Claude Kidd, the receipt of which is hereby acknowledged, we C. F. Early & Bessie D. Early, hereby irrevocably agree to convey to Howard M. Coble and Claude S. Kidd upon demand by him within 30 days from the date hereof, upon the terms and

Kidd v. Early

conditions hereinafter set out, a certain tract or parcel of land located in Monroe Township, Guilford County, North Carolina, and described as follows: 200 acres more or less of The C. F. Early farm. To be determined by a new survey furnished by sellers.

We agree within the time specified, to execute and deliver to Howard M. Coble & Claude S. Kidd or assignee, upon demand by him, a good and sufficient deed for the above described premises upon payment by him to us of the sum of Six Hundred per acre dollars ($600.00) under the following terms and conditions:

In the event of the exercise of this option by Howard M. Coble & Claude S. Kidd, the payment of Five Hundred Dollars ($500.00) this day made shall be credited on the purchase price, and the said purchasers may have reasonable additional time for title examination. This option is placed through G. A. Westbrook, our real estate agent, and we agree to pay said agent _____% commission for handling said sale in the event_____ _____ exercises his option hereunder.

This option being a 30 day          C. F. Early       (Seal)
extension of option drawn           Bessie D. Early   (Seal)
8-4-72                                                 (Seal)
                                                       (Seal)"

On 25 September 1972 Howard M. Coble orally assigned his interest in the option to plaintiff Kidd. Coble and Kidd acknowledged this oral assignment by the execution of a written "Acknowledgment of Agreement" on 25 October 1972. The consideration for this assignment was Dr. Kidd's promise to pay Coble $2,500 when he acquired title to the lands described in the option. On or about 25 September 1972 Kidd assigned one-third of his rights under the option to plaintiff Thomas H. Collins and one-third to plaintiff David P. Dillard.

In the deposition taken by plaintiffs, defendant Early gave the testimony which (except when quoted) is summarized below:

Defendants acquired the land known as the C. F. Early farm through two conveyances of adjoining tracts of land in Monroe Township, Guilford County: (1) Deed dated 5 December 1957 from King Roberts and wife, which described by metes and bounds 214.21 acres; (2) deed dated 5 April 1960 from

Lawrence Junior Gordon and wife, which described by metes and bounds 38.73 acres. These two adjoining tracts contained "some 250 or 260 acres," and defendants own no other land which contains 200 acres. The C. F. Early farm and a non-contiguous 12-acre tract are all the lands defendants own anywhere. It was on "200 acres more or less" of the C. F. Early farm that defendants gave the option to Coble and Dr. Kidd, the particular acreage "to be determined by new survey furnished by sellers [the defendants]."

In order to cut down the expense of the survey which defendants had agreed to furnish the purchasers, Early employed Jerry C. Callicut, a registered land surveyor, about 13 September 1972 to survey and map that portion of the farm which defendants intended to retain instead of the larger portion on which they had given the option. Early said, "By having the portion I was to retain surveyed, I was going to make a deed for the portion that was left." Mr. Westbrook had informed Early that, after surveying the small tract "they would subtract that from the others"; that this method of obtaining a description of the land to be conveyed was agreeable to Dr. Kidd; and that it was acceptable to the Federal Land Bank. Early had previously shown Dr. Kidd as best he could "what boundary lines there were going to be." The survey was completed and a map prepared on 4 October 1972 showing the land defendants were to retain. The map depicted by metes and bounds a tract of 40.52 acres.

After Early gave the option he talked to Westbrook about deferred payments. He first thought he should have as much as 50% down, with the balance "at bank interest." Westbrook told him he could get him the cash, but he did not tell him he had to take cash and he "did not know it until [he] received that registered letter."

Dr. Kidd went to the C. F. Early farm "the first of the week of when—well, the option was out the latter part," and he told Early they were going to buy this place. Early's comment was, "Good." However, when Dr. Kidd suggested he take a second deed of trust for $30,000, Early said: "Well, I'm not going to take a second deed of trust at no price. . . . As far as your money is concerned . . . I want to wait until I go see a CPA to know how to collect this. . . ." After Dr. Kidd's visit Early had a conversation with Westbrook. With regard to this conversation Early said, "I told Westbrook that I was going to

sell it in the way that I would have to pay the government the least money. . . . I found out I couldn't collect over 30%. So Westbrook got in touch with him [Dr. Kidd] and I told him [Westbrook] the terms, not over 30%, with five years to pay the rest at 7½%, with a first deed of trust."

On the following day, 28 September 1972, Kidd and Dillard executed and sent to Early an "Offer to Purchase" in which they agreed to pay $129,000 for the property on the following terms: $2,000.00 in "earnest money," to be held by Westbrook until the transaction was completed; $30,250 upon delivery of the deed; and $96,750 in five equal annual installments plus 4% interest on the unpaid balance. ($1,000 already paid for the option was to be credited.) Defendants objected to the offer, particularly to the provision that the unpaid balance would bear only 4% interest. At that time Early also told Westbrook he was not going to accept cash terms for the property.

In his deposition, verified 5 March 1973, Early said he would no longer accept his proposition of 30% down, balance to be secured by a first deed of trust, payable in five years at 7½% interest because, in his words, "Dr. Kidd hasn't been out there and talked to me, not at all."

On 29 September 1972, Dr. Kidd, acting on his own behalf and as the authorized agent of Collins and Dillard, sought to exercise the option by sending to defendants a letter which read in pertinent part:

"The option granted by you on September 1, 1972, for the purchase of 200 acres more or less of the C. F. Early farm in Monroe Township, Guilford County, North Carolina, is hereby exercised by delivery of a check to your joint order in the sum of $119,000 to my attorneys, Clark & Tanner, 227 Jefferson Building, Greensboro, North Carolina, to be held in trust for you and given over to you upon the occurrence of the following conditions:

(1) The furnishing of a new survey by you of the land being sold as provided in the option agreement;

(2) Delivery by you of a good and marketable warranty deed in fee simple absolute, free of all encumbrances, to the property covered by the option agreement.

"If the survey determines that the land covered by the option consists of more than 200 acres, an additional check will

be delivered for the amount in excess of 200 acres. . . . Please arrange to have the survey completed at the earliest possible date in order that this matter may be expedited. After delivery of the survey and preparation of the deed by your attorney a reasonable time will be taken for title examination prior to final closing by Clark & Tanner with you."

The night after he received the foregoing letter Early again told Westbrook he "was not going to accept the cash terms of the sale of the property." Subsequently, however, on 4 October 1972, on instructions from Early, Westbrook obtained a copy of the survey map from Callicut and delivered it to Dr. Kidd.

The check for $119,000 mentioned in Dr. Kidd's letter of 29 September 1972 was delivered to plaintiffs' attorney, but on 29 September, Dr. Kidd's checking account contained only approximately $17,173.37. However, in an affidavit filed 8 November 1973 in support of plaintiffs' motion for summary judgment, Frank Whitaker, Jr., President of the Federal Land Bank Association of Winston-Salem during September and October 1972, deposed, in brief summary as follows:

Prior to 1 October 1972 he had several conversations with Dr. Kidd "with regard to the Federal Land Bank financing a portion of the purchase price of a tract of land consisting of approximately 200 acres" which plaintiffs proposed to purchase from defendants. In the course of appraising the property he went to the C. F. Early farm where Mr. Early pointed out to him the approximate boundaries of the land he proposed to convey. He obtained copies of the descriptions in the deeds to defendants and later he was also furnished a survey map of the portion of the farm which defendants proposed to retain.

Based on his appraisal and on the financial status of plaintiffs as shown by the information submitted to him a short time prior to 1 October 1972, Mr. Whitaker was prepared to issue to plaintiffs a firm commitment to lend them $100,000 on or about 1 October 1972. The security for this loan was to be the tract of land plaintiffs proposed to buy from defendants, and the loan was conditioned upon plaintiffs obtaining "good title" to the property. The Federal Land Bank was satisfied to have the property described in the deed of trust securing the loan as the Early Farm less the property retained, which was shown on the Callicut map.

Assuming plaintiffs' financial condition remained as strong as it was in September 1972, Whitaker saw no reason why the Federal Land Bank would not issue the same commitment to plaintiffs if they reapplied for the loan.

Plaintiffs' application to the Federal Land Bank showed the following: As of 30 September 1972, Dr. Kidd had a net worth of $102,200; as of 1 October 1972, David Dillard had a net worth of $128,990; and as of 1 October 1972 Thomas Collins had a net worth of $30,410. Subsequent financial statements show that: On 12 November 1973, Dr. Kidd's net worth was $157,235; on 12 November 1973, David Dillard's net worth was $156,723; and on 9 November 1973, Thomas Collins' net worth was $32,536.

In their complaint, plaintiffs alleged that their exercise of the option was valid and that at all times subsequent to 29 September 1972, they have been ready, willing and able to purchase the tract in question. In their answer defendants specifically denied this allegation upon information and belief and alleged, *inter alia,* that the purported exercise of the option was invalid, that the description in the option agreement did not meet the Statute of Frauds and that the check proffered by plaintiffs did not constitute legal tender.

The trial court denied plaintiffs' motion for summary judgment and entered summary judgment for defendants. Upon plaintiffs' appeal the Court of Appeals, in a two-to-one decision, affirmed the trial court's denial of plaintiffs' motion for summary judgment and reversed the entry of summary judgment for defendants. Defendants appealed as of right to this Court and plaintiffs' petition for certiorari was granted.

*Clark, Tanner & Williams by David M. Clark and Eugene S. Tanner, Jr., for plaintiff appellants.*

*Clark, Tanner & Williams by David M. Clark and Eugene S. Tanner, Jr., for plaintiff appellees.*

*Griffin, Post & Deaton by Hugh P. Griffin, Jr., and William F. Horsley for defendant appellants.*

*Sapp and Sapp by Armistead W. Sapp, Jr., and W. Samuel Shaffer II for defendant appellants.*

---

**Kidd v. Early**

---

SHARP, Chief Justice.

Defendants have consistently contended that they are entitled to summary judgment for the following reasons: (1) The description of the property contained in the option is insufficient to meet the requirements of the Statute of Frauds; (2) the purported option was void because the parties failed to agree on an essential element of the contract, that is, the method of payment, and specific performance is unavailable to enforce a contract unless there has been an actual "meeting of the minds" with regard to each element of the contract; and (3) the option could be exercised only by actual tender of cash which plaintiffs failed to do within the option period. If anyone of the foregoing contentions is valid, defendant will be entitled to summary judgment.

Upon motion a summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." G.S. 1A-1, Rule 56(c). The party moving for summary judgment has the burden of establishing the lack of any triable issue of fact. His papers are carefully scrutinized and all inferences are resolved against him. *Caldwell v. Deese,* 288 N.C. 375, 218 S.E. 2d 379 (1975); *Railway Co. v. Werner Industries,* 286 N.C. 89, 209 S.E. 2d 734 (1974); *Page v. Sloan,* 281 N.C. 697, 190 S.E. 2d 189 (1972). The court should never resolve an issue of fact. "However, summary judgments should be looked upon with favor where no genuine issue of material fact is presented." *Kessing v. Mortgage Corp.,* 278 N.C. 523, 534, 180 S.E. 2d 823, 830 (1971). With these principles in mind we consider the questions presented by defendants' appeal.

(1) Does the description contained in the option-contract which plaintiffs seek to enforce meet the requirements of the Statute of Frauds?

[1] An option is not a contract to sell, but it is transformed into one upon acceptance by the optionee in accordance with its terms. *Lawing v. Jaynes* and *Lawing v. McLean,* 285 N.C. 418, 206 S.E. 2d 162 (1974). It then becomes specifically enforceable as a contract to convey if it is otherwise a proper subject for equitable relief. *Byrd v. Freeman,* 252 N.C. 724, 114 S.E. 2d 715 (1960); 81 C.J.S. *Specific Performance* § 47 (1953); 91 C.J.S. *Vendor and Purchaser* § 13 (1955).

**[2]** To be specifically enforceable an option-contract must meet the requirements of the Statute of Frauds (G.S. 22-2), which provides, in pertinent part, that all contracts to convey land "shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized." A valid contract to convey land, therefore, must contain expressly or by necessary implication all the essential features of an agreement to sell, one of which is a description of the land, certain in itself or capable of being rendered certain by reference to an extrinsic source designated therein. *See Lane v. Coe*, 262 N.C. 8, 136 S.E. 2d 269 (1964) ; *Hollman v. Davis*, 238 N.C. 386, 78 S.E. 2d 143 (1953) ; *Searcy v. Logan*, 226 N.C. 562, 39 S.E. 2d 593 (1946) ; *Stewart v. Cary*, 220 N.C. 214, 17 S.E. 2d 29 (1941) ; *Hodges v. Stewart*, 218 N.C. 290, 10 S.E. 2d 723 (1940) ; *Smith v. Joyce*, 214 N.C. 602, 200 S.E. 431 (1939) ; 4 Strong's N. C. Index 2d *Frauds, Statute of* § 2 (1968) ; J. Webster, *Real Estate Law in North Carolina* §§ 119, 121, 122; T. Christopher, *Options to Purchase Real Property in North Carolina,* 44 N.C.L. Rev. 63, 67 (1966).

**[3]** When a description leaves the land "in a state of absolute uncertainty, and refers to nothing extrinsic by which it might be identified with certainty," it is patently ambiguous and parol evidence is not admissible to aid the description. The deed or contract is void. *Lane v. Coe, supra* at 13, 136 S.E. 2d at 273. Whether a description is patently ambiguous is a question of law. *Carlton v. Anderson,* 276 N.C. 564, 173 S.E. 2d 783 (1970). "A description is . . . latently ambiguous if it is insufficient in itself to identify the property but refers to something extrinsic by which identification might possibly be made." *Lane v. Coe, supra* at 13, 136 S.E. 2d at 273.

**[4]** The description which we now construe reads: "a certain tract or parcel of land located in Monroe Township, Guilford County, North Carolina, and described as follows: 200 acres more or less of the C. F. Early farm. To be determined by a new survey furnished by sellers." The C. F. Early farm, according to Early, contains 250-260 acres. (The acreage specified in the deeds by which Early acquired the property is 252.94 acres.) Had the option merely described the land to be conveyed as "200 acres more or less of the C. F. Early Farm" there is no doubt that the description would have been patently ambiguous. A contract to convey a part of a tract of land, to be valid,

must definitely identify the portion to be conveyed or designate the means or source by which it can be positively identified. *See State v. Brooks,* 279 N.C. 45, 52, 181 S.E. 2d 553, 557 (1971) ; *Hodges v. Stewart, supra; Beard v. Taylor,* 157 N.C. 440, 73 S.E. 213 (1911) ; *Cathey v. Lumber Co.,* 151 N.C. 592, 66 S.E. 580 (1909) ; *Smith v. Proctor,* 139 N.C. 314, 51 S.E. 889 (1905).

**[5]**  A contract to convey, excepting a part of the land described, is valid provided the land excepted can be identified. *See* 26 C.J.S. *Deeds* §§ 30 (e), 139 (c) (1956). Such a contract was made and enforced in *Byrd v. Freeman,* 252 N.C. 724, 114 S.E. 2d 715 (1960). In that case Freeman gave Byrd an option to purchase described lands (68 acres, more or less) except the Freeman dwelling and " 'ten acres, more or less on which the same is located,' to be 'run off by a surveyor and properly identified by courses and distances.' " On the same day the option was signed, Byrd and Freeman went upon the land and identified the physical boundaries of the tract to be retained by Freeman. Thereafter each party employed a surveyor and directed him to "run off" the lines which he pointed out to him. Freeman's surveyor produced a map showing a tract containing 11.5 acres; Byrd's suprveyor, a map showing 9.2 acres. Byrd, however, agreed to accept Freeman's ` survey and thereafter exercised his option in time and in accordance with its terms. Notwithstanding, Freeman refused to convey the property and Byrd sued for specific performance. Defendants defended on the sole ground that Byrd had not complied with the terms of the option. The jury answered that issue in favor of Byrd. Defendants made no contention that the description in the option was patently ambiguous and the court enforced the contract without question. *See also Redd v. Taylor,* 270 N.C. 14, 153 S.E. 2d 761 (1967).

**[6]**  Defendants' first contention presents the narrow question whether a contract to convey 200 acres of a larger described tract (the C. F. Early farm) is saved from patent ambiguity by the provision that the acreage is "to be determined by a new survey furnished by the sellers."

As stated in 72 Am. Jur. 2d *Statute of Frauds* § 329 (1974), "There is a definite conflict in the results of cases determining the sufficiency under the Statute of Frauds of a description in a land contract which gives one of the parties the right to select the particular tract to be conveyed." The cases pro and

Kidd v. Early

con are collected in the footnotes to Section 329 and in Annot., 46 A.L.R. 2d 894 (1956) and in the volumes of A.L.R. 2d, Later Case Service. *See also* 49 Am. Jur. *Statute of Frauds* § 350 (1943).

In *Calder v. Third Judicial Court,* 2 Utah 2d 309, 273 P. 2d 168 (1954), the Supreme Court of Utah considered a contract to convey 200 acres of land situated in Davis County, Utah. A part of this land was definitely described, but the larger portion was to be selected in one tract by the buyer (Merrill) within sixty days from a larger tract described in the contract and belonging to the sellers (Calder). In holding the contract valid and specifically enforceable the court noted that the tract from which the selection was to be made by Merrill was sufficiently described in the contract; that the contract specifically provided that Merrill was to select the land within a given time; and this provision, being for the benefit of the sellers, could be waived by them; and that nothing more had to be agreed upon between the parties. The court then adopted the rationale stated by the Supreme Court of Kansas in *Peckham v. Lane,* 81 Kan. 489, 106 P. 464, 466, 25 L.R.A., N.S., 967 (1910):

" ' * * * No reason is apparent why a person may not make a valid contract that he will sell to another one of several pieces of real estate of which he is the owner, to be selected by himself. When an agreement to that effect is written out and signed, it is a complete contract, all of the terms of which are expressed in writing. The owner agrees that he will first make the selection and then make the conveyance. If he refuses to do either, a court may compel him to do both. * * * But he cannot avoid the obligation to which he has committed himself in writing, merely by refusing to act at all. This seems so obvious that the citation of authorities is hardly necessary. The principle, however, is illustrated with more or less fullness in the following cases: *Ellis v. Burden,* 1 Ala. 458, 466; *Carpenter v. Lockhart,* 1 Ind. 434; *Washburn v. Fletcher,* 42 Wis. 152; *Fleishman v. Woods,* 135 Cal. 256, 67 P. 276.' "

In *Delaney v. Shellabarger,* 76 Nev. 341, 353 P. 2d 903 (1960), the Supreme Court of Nevada held valid and enforceable a seller's contract to convey to purchaser any 520-acre tract which purchaser might choose out of a total of 3,518.91 acres which vendor owned. Relying upon *Peckham v. Lane, supra, Calder v. Third Judicial District Court, supra,* and other cited

cases, the court said: "The authorities are to the effect that a contract for the sale and purchase of a part of a larger parcel of land, which gives the purchaser the right to select the particular part, does not for this reason alone render the contract unenforceable." *Id.* at 344, 353 P. 2d at 904.

In *Peckham v. Lane* and the other cases cited above in which the courts relied on Peckham, the parties had not defined even generally the boundaries of the land to be conveyed. Here, however, the vendor had pointed out to the purchaser the outlines of the tract he would retain. Thus the reasoning in *Peckham v. Lane, supra,* is even more persuasive here. The large tract, "the C. F. Early farm," out of which defendants agreed to convey the 200 acres, more or less, was sufficiently described. *Light Co. v. Waters,* 260 N.C. 667, 133 S.E. 2d 450 (1963); *Dill v. Lumber Co.,* 183 N.C. 660, 112 S.E. 740 (1922); *Pate v. Lumber Co.,* 165 N.C. 184, 187, 81 S.E. 132, 133 (1914). Further, the option-contract description also provided the method by which an exact description of the land to be conveyed was to be obtained—a survey furnished by the sellers. The inclusion of this provision in the option in suit distinguishes it from the descriptions found wanting in *Manufacturing Company v. Hendricks,* 106 N.C. 485, 11 S.E. 568 (1890); *Carlton v. Anderson, supra;* and *State v. Brooks, supra,* cases upon which defendants rely to support their contention that the description in question is insufficient to meet the requirements of the Statute of Frauds.

On 29 September 1972, the date plaintiffs notified defendants they were exercising the option of 1 September 1972, defendants had employed a suveyor and directed him to make the survey. Both parties had copies of the surveyor's map on 4 October 1972 and knew not only the boundaries of that portion of the C. F. Early farm which defendants were to retain but that the tract contained 40.52 acres. It is entirely inappropriate that defendants should now contend that the option is void because the description in the option was patently ambiguous.

It is not a ground for objection that the survey was prepared subsequently to the execution of the option. At that time the parties, of course, knew that no survey had been made. They recognized the necessity for one and obviously contemplated that it would be made sometime in the future. *See* 72 Am. Jur. 2d *Statute of Frauds* § 378 (1974).

Once the lands to be retained by the sellers had been surveyed and the description of the property obtained, a conveyance of the C. F. Early farm, excepting the 40-52 acres by metes and bounds as shown by the survey, would operate as a conveyance of the remainder. 26 C.J.S. *Deeds* § 30 (e) (1956). Here we note the statement in 26 C.J.S. *Deeds* § 140 (7) (c) : "Excepted property is described with sufficient certainty if the exact location thereof is left to the election of the grantor or is capable of subsequent ascertainment otherwise."

We hold that the description in the option-contract in suit was sufficient to satisfy the Statute of Frauds and that the latent ambiguity it contained has now been removed.

(2) Is the option agreement void because the parties failed to agree upon two essential elements of any valid option, the method and time of payment? Defendants contend that it is. Plaintiffs contend that the agreement was complete when signed and that, where no terms of payment are stated, the law will imply a payment in cash. With respect to payment the option provided:

"We agree within the time specified [30 days from 9-1-72], to execute and deliver to Howard M. Coble & Claude S. Kidd or assignee, upon demand by him, a good and sufficient deed for the above described premises upon payment by him to us of the sum of Six Hundred per acre dollars ($600.00) under the following terms and conditions:" Between the preceding colon and the next sentence in the printed form, on which the option was written by filling in the blanks, is an inch of space which is entirely blank. The sentence immediately following the blank specifies that if the option is exercised the consideration paid for it shall be credited on the purchase price and "the purchasers may have reasonable additional time for title examination."

It is undoubtedly true that if an offer to sell "necessitates or contemplates a further agreement of the parties in essential matters, the option is invalid." *Atkinson v. Atkinson,* 225 N.C. 120, 130, 33 S.E. 2d 666, 674 (1945). "The courts generally hold a contract, or offer to contract, leaving material portions open for future agreement is nugatory and void for indefiniteness." *Boyce v. McMahan,* 285 N.C. 730, 734, 208 S.E. 2d 692, 695 (1974). This does not mean, however, that the courts will not supply an essential term by implication under appropriate

circumstances. For example, in *Burkhead v. Farlow*, 266 N.C. 595, 598, 146 S.E. 2d 802, 805 (1966), we held that "[i]n any contract to convey land, unless the parties agree differently, the law implies an undertaking on the part of the vendor to convey a good or marketable title to the purchaser."

The following statements from 91 C.J.S. *Vendor & Purchaser* §§ 6 and 10 (1955) speak directly to the question we now consider: "The price to be paid for the property is an essential term [of an option agreement] and must be agreed on; but the option contract need not contain any expressions as to the manner and form of the payment." *Id.* § 6. "Where an option does not specifically fix the time for payment of the purchase price, the law construes the offer to be for cash on delivery and before title passes." *Id.* § 10.

There is an important distinction between cases in which the parties have purported to agree on a contractual provision and have done so in a vague and indefinite manner and cases in which they have remained silent as to a material term. In the latter case, the reasonable conclusion is that they understood the law would imply the omitted term. Since a sale on credit is never implied, absent a provision respecting the time of payment, a contract for the sale of realty will be construed as requiring payment in cash simultaneously with the tender or delivery of the deed. *See J. Calamari & J. Perillo, Contracts* § 23 (1970); L. Simpson *Contracts* § 46 (2d Ed. 1965); 91 C.J.S. *Vendor and Purchaser* § 99c. The foregoing rule was succinctly stated by the Supreme Court of Colorado in *Eppich v. Clifford,* 6 Colo. 493, 498 (1883):

"If the memorandum [with reference to a sale of realty] showed that the sale was upon a credit, but failed to state the terms of such credit, or if in the statement thereof it was indefinite or uncertain, specific performance would be refused; but the memorandum being entirely silent, a sale for cash will be presumed, in such actions, to have been intended." *See Vezaldenos v. Keller,* 254 Cal. App. 2d 816, 62 Cal. Rptr. 808 (1967); *Pearlstein v. Novitch,* 239 Mass. 228, 131 N.E. 853 (1921); *Duke v. Miller,* 355 Mich. 540, 94 N.W. 2d 819 (1959); *Douglas v. Vorpahal,* 167 Wis. 244, 166 N.W. 833 (1918).

That the foregoing rule has long been the law of this State we have no doubt. It is the view expressed by T. Christopher, *Options to Purchase Real Property in North Carolina,*

Kidd v. Early

44 N. C. L. Rev. 63, 72: "The terms of payment need not be set out in great detail, but they should be clear. Where no terms are stated, it would seem that the contract should be interpreted to mean payment in cash since this would be in accord with common practice."

The fact that an unfilled blank on the printed form followed plaintiffs' agreement to deliver to Coble and Kidd or assignee, upon demand, a good and sufficient deed to the premises upon payment to defendants "the sum of *Six Hundred per acre dollars ($600.00)* under the following terms and conditions:" does not render the terms of the contract indefinite or indicate that the time and manner of payment were left open for further negotiation. (Only the words in italics are not a part of the printed form.) *Bank v. Corbett,* 271 N.C. 444, 156 S.E. 2d 835 (1967).

In *Bank v. Corbett,* the defendant, wife of C, as an inducement to the plaintiff bank to extend credit to her husband, signed a "Guaranty" which contained the following provision: "The amount of principal at any one time outstanding for which the undersigned shall be liable as herein set forth shall not exceed the sum of $_____" In disposing of the defendant's contention that the failure to insert in the guaranty a limitation of the guarantor's liability rendered the instrument void Justice Higgins, speaking for the Court, said: "The blank space and the antecedent wording provided the guarantor opportunity to limit her liability for her husband's debts. She executed the agreement without inserting any limitation. She cannot, thereafter, *ex parte,* alter the terms of the agreement. . . . Its terms are clear, free of ambiguity. Consequently, there is nothing for the Court to construe. The meaning becomes a question of law." *Id.* at 447, 156 S.E. 2d at 837. By the same token defendants in this case had the opportunity to require that the purchase price be paid in installments and to specify the time and manner of payment had they desired to do so. They executed the option without inserting any "terms and conditions." Thus, its terms are clear, free of ambiguity and its meaning becomes a question of law.

[7]   We hold that when an option to purchase real estate neither specifies the method of payment nor provides that terms are to be fixed by a later agreement, the law implies that the purchase price will be paid in cash. Thus, the option-contract in this case was not void because of a failure by the parties to agree upon the terms of payment. There being no stipulation as

to the terms of payment in the option and no provision that they were open for future agreement by legal implication the purchase price was to be paid in cash.

Our conclusion that at the time of its execution the option met the requirements of the Statute of Frauds and bound defendants to convey the land if exercised in accordance with its terms, disposes of defendants' argument that subsequent negotiations between the parties—particularly Dr. Kidd's letter of September 28th in which he offered to pay $33,250 cash and $95,750 in five annual installments—amounted to a counter offer and a rejection of defendants' offer as contained in the option.

" 'An option . . . is a contract by which the owner of property agrees with another that he shall have the right to purchase the same at a fixed price within a certain time. It is in legal effect an offer to sell, coupled with an agreement, to hold the offer open for acceptance for the time specified, such agreement being supported by a valuable consideration, or, at common law, being under seal, so that it constitutes a binding and irrevocable contract to sell if the other party shall elect to purchase within the time specified.' " *Ward v. Albertson,* 165 N.C. 218, 221-22, 81 S.E. 168, 169 (1914). *See Sandlin v. Weaver,* 240 N.C. 703, 83 S.E. 2d 806 (1954) ; T. Christopher, *Options to Purchase Real Property in North Carolina, supra* at 63.

[8]    Since an option is a binding contract, it is not revocable by the optionor within the stated option period, and subsequent negotiations which do not result in an agreement to vary the terms of the option, will not constitute a rejection of it. The optionee is not bound to accept the offer contained in the option, but his right of acceptance continues during the option period. *See Trust Co. v. Frazelle,* 226 N.C. 725, 40 S.E. 2d 367 (1946) ; 7 Strong's N. C. Index 2d *Vendor and Purchaser* § 2 (1968) ; 91 C.J.S. *Vendor and Purchaser* § 4 (1955). To hold that an optionee invalidated his option by making a counter proposal would seriously undermine the value of option agreements.

In his work on contracts, with reference to an optionee's counter offer, Professor Corbin writes: "If the original offer is an irrevocable offer, creating in the offeree a 'binding option,' the rule that a counter offer terminates the power of acceptance does not apply. Even if it is reasonable to hold that it terminates a revocable power, it should not be held to terminate rights

and powers created by a contract. A 'binding option' is such a contract (usually unilateral) . . . . A counter offer by such an offeree, or other negotiation not resulting in a contract, does not terminate the power of acceptance." 1 A. Corbin *Contracts* § 91 (1963).

We hold that the subsequent negotiations between the parties including plaintiffs' September 28th "offer to purchase," did not amount to a rejection of the option offer.

(3) Defendants' third contention is that, if the option be held valid, plaintiffs did not effectively exercise it and are therefore not entitled to specific performance. Defendants' argument is that if, by legal implication, the purchase price is to be paid in cash, plaintiffs could have exercised the option only by an actual tender of cash within 30 days from 1 September 1972, and this they did not do. If the option could only be exercised by an actual tender of cash is expired unexercised, for it is quite clear that plaintiffs have never tendered defendants the purchase price in cash.

[9, 10]   Whether tender of the purchase price is necessary to exercise an option depends upon the agreement of the parties as expressed in the particular instrument. The acceptance must be in accordance with the terms of the contract. Where the option requires the payment of the purchase money or a part thereof to accompany the optionee's election to exercise the option, tender of the payment specified is a condition precedent to a formation of a contract to sell unless it is waived by the optionor. On the other hand, the option may merely require that notice be given of the exercise thereof during the term of the option. *See Parks v. Jacobs,* 259 N.C. 129, 129 S.E. 2d 884 (1963) *(per curiam); Kottler v. Martin,* 241 N.C. 369, 85 S.E. 2d 314 (1955) ; T. Christopher, *Options to Purchase Real Property in North Carolina, supra* at 82-84.

[11]   Optionors in this case agreed to convey to optionees, upon demand within 30 days from the date of the option, a deed to the described premises upon payment of $600 per acre (acreage to be determined by survey furnished by sellers), and optionees to be credited with the consideration paid for the option and to "have reasonable additional time for title examination."

Construing this option we hold that it required the optionees to exercise their rights under it within 30 days, but did

not make payment of the purchase price a prerequisite to its exercise. In the first place, until defendants provided plaintiffs with the survey which they had agreed to furnish, plaintiffs could not know the acreage involved and therefore could not determine the full amount of the purchase price. *See Wachovia Bank & Trust Co. v. United States,* 98 F. 2d 609, 611 (4th Cir. 1938). Secondly, we note this significanct provision of the option: "In the event of the exercise of this option . . . the said purchasers *may have a reasonable additional time for title examination.*" (Emphasis added.) Additional time for title examination before they are required to do what? The only sensible answer: Before they are required to tender the cash. The clear import of this language is that, if plaintiffs exercised the option within the option period of 30 days, they would have a reasonable additional time for title examination before they would be required to pay for the land and that the purchase price would be paid in cash simultaneously with the delivery of the deed. *See McAden v. Craig,* 222 N.C. 497, 500, 24 S.E. 2d 1, 3 (1943) ; *Phelps v. Davenport,* 151 N.C. 21, 65 S.E. 459 (1909). Any other construction would render the provision meaningless.

Defendants' contention that the conclusion we have reached is precluded by *Trust Co. v. Medford,* 258 N.C. 146, 128 S.E. 2d 141 (1962) cannot be sustained. In *Medford* the option required the optionee to demand a deed within thirty days and to pay the purchase price in full at the end of thirty days. In the event of the exercise of the option, optionee was to have "reasonable additional time for title examination." Within the thirty days counsel for the optionee discovered a flaw in the title and "turned it down." Optionee employed another attorney who requested an extension of the option pending his further efforts to clear the title. The optionor declined to give the extension. By its terms the option expired on July 10th. It was not until September 2nd, fifty-three days after the option had expired, that the optionee gave notice of his election to exercise the option. In the meantime a building on the property had burned and the owner became entitled to $45,000 insurance. The real controversy in the case was who would "pick up" the $45,000. In sustaining the trial court's judgment of compulsory nonsuit from which the plaintiffs had appealed, this Court held that the optionee, "within 30 days from the date of the option was required to bind himself to go through with and complete the transaction provided the defendant could convey a good title.

His binding obligation (conditioned upon a good title) was required within the 30 days life of the option in order to effect any extension of time for title examination." *Id.* at 149, 128 S.E. 2d at 143-44. In *Medford,* the optionee failed to bind himself within thirty days; in this case the optionee exercised the option and became bound.

Since we conclude that plaintiffs exercised the option by written notification dated September 29, 1972, any question concerning actual tender is rendered academic by defendants' deposition. As set out in the preliminary statement of facts, in his deposition defendant testified that he had decided to sell the property in the way he would have to pay the government the least money, and he told Dr. Kidd during the last week of the option term that he had to wait until he had seen a CPA to know how to collect the purchase price. After doing so he instructed his broker to tell Dr. Kidd he would accept "not over 30% in cash, with five years to pay the rest at 7½%, with a first deed of trust." These terms, of course, bore no resemblance to the requirements of the option. In their brief, first filed in the Court of Appeals, defendants concede that they "would not accept all cash" and plaintiffs knew they would not do so.

[12]　What we said in *Oil Co. v. Furlonge,* 257 N.C. 388, 393-94, 126 S.E. 2d 167, 171 (1962) is applicable here. "Notice from defendants that they would not carry out the terms of the option made unnecessary a tender of payment by the plaintiff. *Millikan v. Simmons,* 244 N.C. 195, 93 S.E. 2d 59; *Penny v. Nowell,* 231 N.C. 154, 56 S.E. 2d 428. As the Court said with reference to a similar situation in the latter case, 'such a tender would avail nothing according to the testimony of the record. The law does not require the doing of a vain thing. The disavowal was a waiver of the requirement.' " *See also Trust Co. v. Frazelle, supra; Johnson v. Noles,* 224 N.C. 542, 31 S.E. 2d 637 (1944) ; T. Christopher, *Options to Purchase Real Property in North Carolina, supra* at 82-83.

The record leaves no doubt that the parties intended a valid option contract. Plaintiffs paid, and defendants accepted, $500 for the original option of 4 August 1972 and another $500 for the renewal option of 1 September 1972. When Dr. Kidd told Early a day or two before he notified him on 29 September 1972 that plaintiffs were exercising the option, Early's comment was, "Good." However, he also said, "As far as your money is con-

cerned I want to wait until I can see a CPA to know how to collect this." It is also implicit in the record that this controversy grew out of defendants' belated consideration of the tax consequences of their sale of the property. Apparently it was only after they had signed the option that they became aware of the tax advantages of certain installment payments.

Finally, we consider whether plaintiffs are entitled to summary judgment. We note that the following facts are not in issue: (1) On 1 September 1972 defendants executed and delivered to Dr. Kidd the option in suit; (2) thereafter the parties made no agreement modifying the terms of the option although they negotiated with reference to the terms of payment; (3) plaintiffs sent and defendants received the letter of September 29th in which they stated that the option "is hereby exercised. . . . ; " (4) defendants refused to convey for cash, both before and after receiving the letter, and have continued to refuse; and (5) defendants caused the survey called for in the option to be made and delivered to plaintiffs.

On these uncontested facts we have held: (1) The option met the requirements of the Statute of Frauds and constituted an irrevocable offer of sale during the thirty days specified; (2) Dr. Kidd's letter of September 29th to defendants constituted an acceptance of the option and converted it into a contract to convey; and (3) the option required payment in cash upon tender of the deed.

Defendants allege no grounds for the cancellation or rescission of the option; nor do they contest plaintiffs' right to specific performance on the ground that to decree it would be inequitable. The defenses upon which they rely are legal, that is, that the option was void or, if valid, that it had not been exercised in accordance with its terms. " 'It is accepted doctrine that a binding contract to convey land, when there has been no fraud or mistake or undue influence or oppression, will be specifically enforced. (Cites omitted.)' " *Hutchins v. Honeycutt,* 286 N.C. 314, 318, 210 S.E. 2d 254, 256-57 (1974). Thus, it would appear that plaintiffs are entitled to summary judgment decreeing specific performance unless there is a genuine issue of fact as to whether plaintiffs were ready, willing and able at all times to perform their side of the bargain. *See Johnson v. Noles,* 224 N.C. 542, 31 S.E. 2d 637 (1944) ; *Ward v. Albertson,* 165 N.C. 218, 81 S.E. 168 (1914) ; 81 C.J.S. *Specific Performance* § 91 (1953).

Rule 56(c) of the North Carolina Rules of Civil Procedure provides in pertinent part that, upon motion, summary judgment shall be rendered forthwith "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." As indicated, plaintiffs' readiness, willingness, and ability to pay the purchase price are material facts. If there exists a genuine issue as to them summary judgment would be impermissible, otherwise summary judgment for plaintiffs must be granted.

With regard to this issue the record shows the following: (1) Plaintiffs allege in their complaint that on 29 September 1972 they were ready, willing, and able to purchase the land described in the option. (2) In their answer defendants deny this allegation *on information and belief.* (3) Plaintiffs move for summary judgment supporting their motion (a) with their own affidavits, loan applications and financial statements, which showed their total net worth to have been $261,600 on September 29th and $346,494 in November 1973; and (b) with the affidavit of the president of the Federal Land Bank Association of Winston-Salem that he was and is prepared to issue plaintiffs a firm loan commitment of $100,000 "on security of the tract of land they propose to purchase" from defendants provided the title is good. (4) In opposition to the motion defendants failed to produce any counter affidavits or other evidentiary matter justifying their opposition as provided by G.S. 1A-1, Rule 56(e) and (f).

Rule 56(e) sets forth the content requirement for affidavits and provides, *inter alia:* "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, *if appropriate,* shall be entered against him." (Emphasis added.)

Rule 56(f) provides: "Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to

be taken or discovery to be had or may make such other order as is just."

Since defendants failed to support their general denial of plaintiffs' readiness and ability to pay and failed to utilize Rule 56(f) with regard to this issue, the question in this case is whether summary judgment for plaintiffs was *appropriate.* See *Savings and Loan Assoc. v. Trust Co.*, 282 N.C. 44, 191 S.E. 2d 683 (1972).

Plaintiffs, as the moving party, have the burden of establishing that no genuine issue as to any material facts exists. *Savings and Loan Assoc. v. Trust Co., supra.* They also have the burden of persuasion with regard to the issue here. It follows, therefore, that the motion must be denied if the opposing party submits affidavits or other supporting material which casts doubts upon the existence of a material fact or upon the credibilitiy of a material witness, or if such doubts are raised by movant's own evidentiary material. 6 J. Moore, *Federal Practice* ¶ 56.15[4] (2d Ed. 1975) (hereinafter cited as Moore). However, not every failure of the opposing party to respond will require the entry of summary judgment. *Savings and Loan Assoc. v. Trust Co., supra.*

In an article by M. Louis, *A Survey of Decisions Under the North Carolina Rules of Civil Procedures,* 44 N. C. L. Rev. 729 (1972), it is pointed out that for summary judgment to be appropriate for the party with the burden of persuasion "he must still succeed on the strength of his own evidence" even though his affidavits and supporting material are not challenged as provided by sections (e) and (f) of Rule 56:

"Consequently the motion should ordinarily be denied even though the opposing party makes no response, if (1) the movant's supporting evidence is self contradictory or circumstantially suspicious or the credibility of a witness is inherently suspect either because he is interested in the outcome of the case and the facts are peculiarly within his knowledge or because he has testified as to matters of opinion involving a substantial margin for honest error, (2) there are significant gaps in the movant's evidence or it is circumstantial and reasonably allows inferences inconsistent with the existence of an essential element, or (3) although all the evidentiary or historical facts are established, reasonable minds may still differ over their application to some principle such as the prudent man

standard for negligence cases." *Id.* at 738-739. *See also* 10 C. Wright & Miller, *Federal Practice and Procedure* § 2725 (1973) (hereinafter cited as Wright & Miller).

Of the foregoing standards Nos. (2) and (3) have no application here. As to No. (1), plaintiffs' affidavits, the affidavit of the bank president, and plaintiffs' financial conditions are not self-contradictory or circumstantially suspicious and, as stated, they allow no reasonable inferences inconsistent with the conclusion that plaintiffs were, at all times, ready, willing and able to perform. Plaintiffs' pleadings, affidavits, and financial statements show their net worth was more than sufficient to meet the purchase price of the land. They are, however, interested in the outcome of the case and the financial condition of each is a matter peculiarly within his knowledge. Further, the affidavit of the bank president, without plaintiffs' supporting affidavits, is insufficient to show that they were at all times ready, willing and able to perform. Plaintiffs, therefore, are relying on their own testimony to establish their ability to pay.

If plaintiffs' interest necessarily raises a question of their credibility, and their testimony cannot, under any circumstances, be accorded credibility as a matter of law, summary judgment would be inappropriate. To date this Court has not ruled on the question whether a party with the burden of proving a material fact is entitled to summary judgment when (1) he relies upon his own testimony, which is not inherently incredible and is neither self-contradictory nor susceptible to conflicting inferences, to establish that fact; and (2) the opposing party does not support the general denial of that fact in his pleadings by affidavits under Rule 56(e) or (f). This is the specific question which we must now answer.

As all the commentators point out, "It is in the situation where the movant's facts, taken as true, would entitle him to summary jugdment, and the opposing party has neither shown any facts contradicting movant's, nor made any attack on the credibility of movant's witnesses, that there is special difficulty in determining whether an issue of credibilitiy is present." 6 Moore ¶ 56.15[4].

In 10 Wright & Miller § 2726, the authors say: "Questions of credibility have given the courts considerable difficulty. Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeach-

ment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact. A problem arises, however, when there only are latent doubts as to credibility, as when some of the evidence necessary to establish that no genuine issue exists is presented by an 'interested' person or in affidavit form so that there has been no chance for the opposing party to cross-examine."

Noting that certain courts have taken a restrictive view of the summary judgument procedure, usually finding "a lurking issue" of credibility for the jury, especially when the evidence is based on affidavits, Wright & Miller say, "Fortunately . . . the general rule is that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment." *Id.*

That courts are slow to grant summary judgment when a movant presents his own affidavit concerning facts which are peculiarly within his knowledge, and that movant's uncontradicted and unimpeached proofs do not import veracity merely because they are uncontradicted by the opposing party, is well established. "It is also clear that the opposing party is not entitled to have the motion denied on the mere hope that at trial he will be able to discredit movant's evidence; he must, at the hearing, be able to point out to the court something indicating the existence of a triable issue of material fact." 6 Moore ¶ 56.15[4].

From the foregoing discussion, it is quite clear that it would be futile to attempt to state a general rule which would determine whether a "genuine issue of fact" exists in a particular case. It is equally clear, however, that issues must be raised in the manner prescribed by the Rules of Civil Procedure, and G.S. 1A-1, Rule 56, prescribed the procedure applicable here.

In 1902 summary judgment procedure in actions on contracts in the District of Columbia was indistinguishable from that of our Rule 56. In disposing of the argument that it deprived the defendants of the right to a jury trial, the Supreme Court of the United States said:

"If it were true that the rule deprived the plaintiff in error of the *right* of trial by jury, we should pronounce it void without reference to cases. But it does not do so. It prescribes

the means of making an issue. The issue made as prescribed, the right of trial by jury accrues. The purpose of the rule is to preserve the court from frivolous defenses, and to defeat attempts to use formal pleadings as means to delay the recovery of just demands.

"Certainly a salutary purpose, and hardly less essential to justice than the ultimate means of trial . . . . " *Fidelity & Deposit Co. of Maryland v. United States,* 187 U.S. 315, 320, 47 L.Ed. 194, 197-198, 23 S.Ct. 120, 122 (1902).

In equivalent language, in 1923, the Court of Appeals of New York sustained its summary judgment procedure ("rule 113") from a similar attack: "The rule in question is simply one regulating and prescribing procedure, whereby the court may summarily determine whether or not a *bona fide* issue exsists between the parties to the action. A determination by the court that such issue is presented requires the denial of an application for summary judgment and trial of the issue by jury at the election of either party. On the other hand, if the pleadings and affidavits of plaintiff disclose that no defense exists to the cause of action, and a defendant, as in the instant case, fails to controvert such evidence and establish by affidavit or proof that it has a real defense and should be permitted to defend, the court may determine that no issue triable by jury exists between the parties and grant summary judgment." *General Investment Co. v. Interborough Rapid Trans. Co.,* 235 N.Y. 133, 142-43, 139 N.E. 216, 220 (1923).

The foregoing analyses are, of course, "fully applicable to Rule 56," a fact which Wright & Miller noted in stating (1) that most courts have simply said, "The rule was not intended to deprive a party of a jury trial"; (2) that the federal courts take great care not to deny the non-moving party a full trial once it is shown that a genuine issue of fact exists or that the judgment ultimately might depend on the credibility of witnesses; and (3) that once the court determines that there are no disputed material facts, it does not deprive the opposing party of his right to jury trial by entering a judgment on the basis of a determination of the governing legal issues. 10 Wright & Miller § 2714. *See* 6 Moore ¶ 56.06[1].

Nothing in our State Constitution nor in our decisions precludes summary judgment in favor of a party with the burden of persuasion when the opposing party has failed to respond to

the motion in the manner required by Rule 56(e) or (f) and no "genuine issue as to any material fact" arises out of movant's own evidence or the situation itself challenges credibility. Under these circumstances Rule 56(e) provides that summary judgment *shall be entered.*

*Cutts v. Casey,* 278 N.C. 390, 180 S.E. 2d 297 (1971) does not control decision here. In that case, which involved a motion for a directed verdict upon conflicting evidence on a strenuously contested issue of fact, neither a directed verdict nor a motion for summary judgment could have been appropriate.

The purpose of Rule 56 is to prevent unnecessary trials when there are no genuine issues of fact and to identify and separate such issues if they are present. To this end the rule requires the party opposing a motion for summary judgment—notwithstanding a general denial in his pleadings—to show that he has, or will have, evidence sufficient to raise an issue of fact. If he does *not,* "summary judgment, if appropriate, shall be entered against him." To hold that courts are not entitled to assign credibility as a matter of law to a moving party's affidavit when the opposing party has ignored the provisions of sections (e) and (f) would be to cripple Rule 56. *See* 10 Wright & Miller § 2740.

**[13]** We hold that summary judgment may be granted for a party with the burden of proof on the basis of his own affidavits (1) when there are only latent doubts as to the affiant's credibility; (2) when the opposing party has failed to introduce any materials supporting his opposition, failed to point to specific areas of impeachment and contradiction, and failed to utilize Rule 56(f); and (3) when summary judgment is otherwise appropriate. This is not a holding that the trial court is required to assign credibility to a party's affidavits merely because they are uncontradicted. To be entitled to summary judgment the movant *must still* succeed on the basis of his own materials. He must show that there are no genuine issues of fact; that there are no gaps in his proof; that no inferences inconsistent with his recovery arise from his evidence; and that there is no standard that must be applied to the facts by the jury. Further, if the affidavits seem inherently incredible; if the circumstances themselves are suspect; or if the need for cross-examination appears, the court is free to deny the summary judgment motion. Needless to say, the party with the burden of proof, who moves for summary judgment supported only

by his own affidavits, will ordinarily not be able to meet these requirements and thus will not be entitled to summary judgment.

[14]   We now apply the foregoing principles to the facts of this case. As previously indicated, plaintiffs' affidavits and supporting materials, if true, establish the material fact that, upon tender of the deed, they were ready, willing, and able to pay defendants cash for the property. As to the credibility of these affidavits there are only latent doubts, that is doubts which stem from the fact that plaintiffs are interested parties. Defendants, however, have not produced any contradictory affidavits, have not pointed to any specific grounds for impeachment, and have not utilized Section (f) to show why they could not justify their opposition to plaintiffs' motion. Further, the affidavit of the disinterested bank president strongly corroborates plaintiffs' affidavits and financial statements and tends to show that plaintiffs were able to perform.

Here we again note that plaintiffs were not required to have the cash in hand on the day they exercised the option. By its terms they had a reasonable time thereafter to examine the title and that, of course, also gave them a reasonable time to close their approved loan. After defendants repudiated the contract plaintiffs were not required to liquidate their assets or to borrow money in order to keep cash on hand. "Thereafter, the tender of the balance of the purchase price and a demand for the deed was unnecessary. It is enough that plaintiff is ready, able, and willing and offers to perform in his pleading." *Johnson v. Noles,* 224 N.C. 542, 547, 31 S.E. 2d 637, 640 (1944). As long as their combined assets remained sufficient to enable them to raise the money within a reasonable time they could properly rely on the court's decree to give them a reasonable time to do so.

In any decree for specific performance of a contract to convey, the court will protect the rights of the vendor by requiring the vendee to comply with his part of the contract within a reasonable time, to be fixed by the court, before vendor parts with his deed. If the vendee fails to comply with the decree his right to specific performance will be denied and the action dismissed. *Bateman v. Hopkins,* 157 N.C. 470, 73 S.E. 133 (1911). For this reason, "the latent doubts" as to the credibility of plaintiffs' affidavits (raised by their interest in the action) have little, if any, significance. Further, the institution of this

suit, was an objective indication of plaintiffs' readiness and willingness to perform.

The record does not indicate the grounds upon which the trial court granted defendants' motion for summary judgment but, on plaintiffs' showing, it could not have been on the ground that they were not ready, willing, and able to pay the purchase price in cash. Obviously the judge granted the motion on the theory that the option was invalid. Indeed, on appeal, defendants' only argument with reference to plaintiffs' cross-motion for summary judgment is that it was correctly denied because plaintiffs "have failed to show that the contract is complete or enforceable."

We hold, therefore, that plaintiffs' affidavits and supporting materials have shown their readiness, willingness, and ability to perform their part of the option-contract, and defendants having failed to respond thereto as provided by Section (f) of Rule 56, under the circumstances of this case, summary judgment against defendants decreeing specific performance of the option-contract was appropriate, and the trial court erred in not entering it.

That portion of the decision of the Court of Appeals which sustained the trial judge's denial of plaintiffs' motion for summary judgment is reversed with directions that the case be remanded to the Superior Court for entry of the decree of specific performance in accordance with this opinion.

Affirmed in part; reversed in part.