**SOUTHEAST CINEMA ENTERTAINMENT, INC., Successor by Merger to Northridge Cinemas, Inc., Plaintiff,**

v.

**P.B. REALTY, INC., Defendant.**

**C.A. No. 9:06–cv–2639–PMD.**

United States District Court,
D. South Carolina,
Beaufort Division.

Feb. 21, 2008.

Thomas P. Guerard, William C. Cleveland, Buist Moore Smythe McGee, Charleston, SC, H. Arthur Bolick, II, Reid Lloyd Phillips, Brooks Pierce McLendon Humphrey and Leonard, Greensboro, NC, for Plaintiff.

William B. Harvey, III, Harvey and Battey, Beaufort, SC, Pamela S. Duffy, Wishart Norris Henninger and Pittman, Burlington, NC, Robert J. Wishart, Wishart Norris Henninger and Pittman, Charlotte, NC, for Defendant.

## ORDER

PATRICK MICHAEL DUFFY, District Judge.

This matter is before the court upon the parties' cross-motions for summary judgment. On November 12, 2007, Plaintiff Southeast Cinema Entertainment, Inc. ("Plaintiff" or "SE Cinema") filed a Motion for Summary Judgment and a Motion for Partial Summary Judgment, which Defendant P.B. Realty, Inc. ("Defendant" or "PB Realty") opposes. On November 13, 2007, PB Realty filed a Motion for Summary Judgment, which Plaintiff opposes. A hearing was held on February 5, 2008, at 10:30 a.m. For the reasons set forth herein, the court grants Plaintiff's Motion for Summary Judgment and Motion for Partial Summary Judgment, and denies Defendant's Motion for Summary Judgment.

## BACKGROUND

On February 16, 1996, PB Realty entered into a ten-year lease agreement[1] with Northridge Cinemas, Inc. ("Northridge") whereby PB Realty leased certain property in Hilton Head, South Carolina, to Northridge. (Def.'s Mot. for

1. The Lease indicates that it shall be "governed by and construed in accordance with North Carolina law." (Def.'s Mot. for Summ. J. Ex. A at 19.)

Summ. J. Ex. A at 1.)[2] The premises are described as follows:

Landlord [PB Realty] hereby leases to Tenant [Northridge], and Tenant hereby takes from Landlord, a portion of a building located in the Northridge Plaza, Hilton Head, South Carolina, known as the old Brendle's building with a total size of 36,700 Square Feet as more particularly described in Exhibit A attached hereto, hereinafter referred to as "Premises."

(Id.) The term of this lease (the "Lease") was for a ten year period; it commenced on August 1, 1996, and continued until August 1, 2006.(Id.) The Lease also contained a provision whereby Northridge had four consecutive options to extend the terms of the Lease for three years at a time. (Id.) The option to renew for the period 2006 to 2009 indicated that the rent would be $220,200.00 "multiplied by the CPI increased over the previous five (5) years." (Id. at 2.) Furthermore, the Lease contained an option to purchase:

7. *Option to Purchase.* At the end of the fifth rental year (Aug. 1, 2001), Tenant [Northridge Cinema] will have an option to purchase the overall property at a price to be determined by multiplying ten (10) times the annual rental rate for the next subsequent lease period, including the total rent for the overall building. Tenant will have an option to purchase at the end of each subsequent lease period, based on the above formula.

(Id. at 3.) The Lease does not indicate how either the option to renew or the option to purchase must be exercised. (Id. at 2–3.)

2. On February 24, 2003, Northridge Cinemas merged into Southeast Cinema and assigned the Lease to Southeast Cinema. (Paul Broyhill Depo. 47:12–47:24.) PB Realty accepted that assignment on May 20, 2003.

There have been several negotiations between PB Realty and Northridge to purchase the property. R.S. Smith ("Smith") of Northridge made an offer to buy the property as early as January of 1998; in a letter, dated January 8, 1998, from Smith to Hunt Broyhill of PB Realty, Smith states, "I have not heard back from you on my offer to buy the property with a counter offer. I will assume this is a dead issue for now." (Def.'s Mot. for Summ. J. Ex. B.) Several years later, on February 26, 2002, Jerome Miller, Smith's attorney, wrote to Paul Broyhill of PB Realty, and this letter stated,

> I represent Steve Smith with regard to his intent to exercise his option to purchase the theater building located at Northridge Plaza in Hilton Head.
>
> Paragraph 7 of the existing Lease provides for the option and method for establishing the price. At your earliest opportunity, I would appreciate your forwarding a copy of the Lease for Health Quest, the other tenant in the building.
>
> Once we have received that Lease, we will calculate the purchase price.
>
> Thank you for your kind assistance in this matter.

(Def.'s Mot. for Summ. J. Ex. C.)

Stonehaven Investments, LLC ("Stonehaven"), a separate entity owned by Smith, owns land adjacent to the property at issue in the case *sub judice.* At some point during 2005, Home Depot contacted PB Realty and inquired about purchasing the property at issue, as well as the adjacent property. (Smith Dep. 22:1–22:19, 44:11–12, 62:12–17.) PB Realty instructed Home Depot to contact Northridge, as Northridge had a long-term lease and an option to buy the property. (Smith Dep. 22:5–22:11.) Home Depot did contact Northridge and signed a nonbinding letter of intent to purchase the property. (Smith Dep. 22:1–22:19.)

On May 19, 2006, Miller wrote on behalf of Smith to PB Realty. This letter stated,

> I represent Steve Smith with regard to matters arising under the above lease. Paragraph 7 of the lease contains an option purchase. It appears at this time that Steve will want to exercise the option, with closing likely to occur this fall.
>
> At your convenience, I would appreciate your furnishing me a copy of the lease on the Health Quest Fitness Center in the same complex.

(Def.'s Mot. for Summ. J. Ex. D.) On June 20, 2006, Hunt Broyhill ("Hunt") and Steve Smith spoke via telephone. Smith deposed that during this conversation, Hunt expressed concern that the other tenant, Health Quest, might leave and that because the purchase price was a multiple of rent, he might be damaged with respect to the purchase price if Health Quest did vacate the premises. (Smith Dep. 30:5–30:9.) Smith deposed that he told Hunt that he "had already figured in the tenant being there" in the purchase price and that even if the tenant vacated, he would be paid as if the tenant was still there. (Smith Dep. 30:10–30:14.) When Hunt indicated that he would rather get a "purchase contract" in place as opposed to memoralizing this agreement in a writing, Smith assented and indicated that he would talk to Miller, his attorney. (Smith Dep. 30:15–30:20.) Smith further deposed that he and Hunt talked about a time for the closing; Smith stated, "I told him [(Hunt)] that I was ready and able to close on August the 1 st, if that's what we needed to do, but that I would rather close in conjunction with Home Depot." (Smith Dep. 31:1–31:4.) Smith also deposed that he told Hunt he would "close with him, no matter what, before December the 31st," and according to Smith, Hunt agreed, stating that was "fine with him." (Smith Dep. 31:1–31:10.) Regarding this same tele-

phone conversation, Hunt deposed that they talked about the "potential to execute" the option and that Smith "may indeed not want to close were there not an opportunity with Home Depot." (Hunt Broyhill Dep. 47–48.)

Miller again wrote to PB realty on July 13, 2006; this letter to Hunt stated,

I am enclosing a copy of my letter of May 19 for reference. In reviewing paragraph 7 of the lease, *I wanted to be certain that we did not miss the deadline for exercising the option to purchase.*

As you know, the first option date was August 1, 2001. The lease provides "tenant will have an option to purchase at the end of each subsequent lease period, based on the above formula." The lease does not define lease period, but it appears to me that lease period means each anniversary, or August 1 of each year.

As you know, we are working toward a closing with Home Depot. Unfortunately, the lease does not provide when the closing will occur in the event of exercise of the option.

Therefore, I would ask your permission to grant us some leeway for a closing date.

*I would suggest that this letter will constitute our exercise of the option,* notice being due August 1, 2006, with an agreement on your part that closing can occur by the end of the year. If you are in agreement, please indicate your acceptance by signing the bottom of this letter and returning one copy to me.

(Def.'s Mot. for Summ. J. Ex. E (emphasis added).)

Hunt responded to Miller's letter on July 21, 2006, via email. Hunt indicated to Miller that he had received the letter dated July 13. (Def.'s Mot. for Summ. J. Ex. F.) The email further stated,

Obviously Steve [Smith] has the right to execute his option. However, if this is his desire, I think it is appropriate to create a legal contract to sell the building with a closing no later than 12–31. The contract could be conditional subject to Home Depot's execution of a corresponding contract with Steve Smith. We also have the issue of how our tenant at Island Solutions would be treated if she were forced to move. I feel a great deal of responsibility to her fair treatment and feel that terms with her should be reached prior to our release of the building.

(Def.'s Mot. for Summ. J. Ex. F.)

Northridge submitted a proposed contract on August 25, 2006. (Def.'s Mot. for Summ. J. Ex. G.) The proposed contract indicated that it was to be between Stonehaven Investments, LLC, and PB Realty (*Id.* at 2.) The purchase price was listed at $3,447,000.00, and the proposed contract indicated that closing was "to be contemporaneous with the closing of the sale of this property to Home Depot USA, Inc. by Stonehaven Investments, LLC." (*Id.* at 3.) The proposed contract also contained an "examination period," which was to begin on the contract date and extend through March 31, 2007. (*Id.*)

On August 29, 2006, Andrew McCullough, attorney for PB Realty, wrote to Smith and stated,

As you are aware, your Lease expired as of August 1, 2006. Accordingly, you are now a holdover tenant subject to a month-to-month tenancy at the premises pursuant to Paragraph 28 of the Lease. As a result of the Lease expiration, your rights under the Lease are terminated and your possession may be terminated upon the providing of 20 days written notice to you by the Landlord. We are not providing that notice at this time. Our client has indicated that you have

paid holdover rent for August and looks forward to receiving the September holdover rent as provided in Paragraph 28.

As you are aware, our client rejected your previous request to vary the terms of the option to purchase provided in Paragraph 7 of the Lease. Since you did not exercise the option to purchase the premises at the end of the term in accordance with the terms of Paragraph 7, the option to purchase expired along with the Lease.

(Def.'s Mot. for Summ. J. Ex. H.) PB Realty refuses to convey the property to SE Cinema, but other entities or individuals have since offered to purchase the property; Hunt informed the inquiring parties that they would have to wait until resolution of the instant case. (Hunt Broyhill Depo. 73:23–74:17.)

SE Cinema, as successor by merger to Northridge, filed suit against PB Realty on September 25, 2006, seeking an order requiring specific performance of the option and requiring PB Realty to convey the property to SE Cinema. (*See* Verified Compl.) In the alternative, SE Cinema asserted PB Realty should be estopped from contending that the Lease expired and that PB Realty breached its contract with SE Cinema. (*Id.*) PB Realty filed a Motion to Dismiss pursuant to Rule 12(b)(6) on November 15, 2006, arguing (1) the option is unenforceable because price is determined based on "CPI," which is an undefined term and because even if interpreted to mean the Consumer Price Index, there are several such indices; (2) SE Cinema did not exercise its option before August 1, 2006, because it merely expressed vague future intentions, failed to tender any purchase money, and failed to enter into a written purchase agreement. (*See* Mot. to Dismiss.) PB Realty also asserted that SE Cinema had not established any misrepresentation or fraud on

PB Realty's part and that it could not establish reasonable reliance. (*Id.*)

Plaintiff filed a Motion to Amend Complaint on December 19, 2006, and an Amended Verified Complaint was filed on January 17, 2007. Among other things, the Amended Verified Complaint added allegations concerning Home Depot's interest in the property. (*See* Am. Verified Compl.) In Defendant's Answer to the Amended Verified Complaint, Defendant asserted a counterclaim against Plaintiff, seeking a declaratory judgment that the purchase option is invalid. In the alternative, Defendant seeks a declaratory judgment that the purchase option expired before it was exercised.

This court issued an order denying PB Realty's Motion to Dismiss on April 17, 2007. With respect to PB Realty's argument that the option was invalid because "CPI" was not defined in the contract, the court stated, " 'CPI' is not a defined term within the Lease; however, interpreting this term according to its natural and obvious meaning and without resorting to subtle, forced, strained or unusual meaning, 'CPI' means the consumer price index published by the Bureau of Labor Statistics or its successor." (Order at 5–6.) The court noted the problem with this definition is that the Bureau of Statistics purchases more than one consumer price index. The court continued, "Accordingly, the court must determine whether a calculation referring to the 'CPI,' without specifying *which* consumer price index, describes a method for determining the purchase price which is 'definite within itself or capable of being made definite.' " (Order at 6.) Because "CPI" is an undefined term capable of several interpretations, the court concluded the term was ambiguous. (*Id.*) However, concluding that the "term 'CPI' is not so indefinite as to render it impossible to fulfill the parties' intention," the

court determined the option was not void on its face as the parties "will be allowed to introduce parol and extrinsic evidence to establish the parties' intention, or to establish the custom or usage in the trade." (*Id.* at 7.)

The court then addressed whether SE Cinema sufficiently alleged that it timely and effectively exercised the option to purchase. The court noted that when the option did not specify the manner in which it must be exercised, "any form of timely notice of the optionee's unqualified acceptance serves to create a binding contract of sale." (Order at 8.) The court further concluded that the letter of May 19, 2006 "is a sufficient manifestation of Southeast's determination to exercise the option to purchase such that the option became a binding contract to convey at that time." (*See* Order at 8–9.) The court rejected PB Realty's argument that SE Cinema's acceptance was ineffective and constituted a counteroffer because the letter of July 13 and the August 25 proposed purchase agreement changed the terms of the sale, stating that because the May 19, 2006 letter "effectively formed a binding contract to convey, evidence of negotiations of the terms of the sale *after* acceptance of the option to not disturb the enforceability of the contract created upon acceptance." (*Id.* at 9.) Lastly, the court concluded that the facts as alleged in the Amended Verified Complaint could support estoppel against PB Realty. (*Id.* at 11.) This court thus denied PB Realty's Motion to Dismiss.

### STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

### ANALYSIS

**A. Whether the Option Is Valid**

■ The court must first determine whether the Plaintiff has a valid option to purchase the real estate at issue in this case. The dispute centers on the fact that the Lease agreement indicated Northridge "will have an option to purchase the overall property at a price to be determined by multiplying ten (10) times the annual rental rate for the next subsequent lease period, including the total rent for the overall

building." (Def.'s Mot. for Summ. J. Ex. A at 3.) The rent for the subsequent lease period indicated that the rent would be $220,200.00 "multiplied by the CPI increased over the previous five (5) years." (*Id.* at 2.) Plaintiff argues the option is valid because the term "CPI" is sufficiently definite to determine price, while Defendant argues the option is invalid because such a determination is impossible.

Under North Carolina law, to be specifically enforceable an option contract must be in writing, "must contain expressly or by necessary implication" all the essential features of a written contract to convey land, and must state a definite period for exercising the option. N.C.G.S.A. § 22–2; *see Kidd v. Early,* 289 N.C. 343, 352–53, 222 S.E.2d 392, 399–400 (1976); *Craig v. Kessing,* 36 N.C.App. 389, 244 S.E.2d 721 (1978) (noting that the statute of frauds is applicable to option contracts for the purchase of property). "[A] contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as a result of future negotiations." *Connor v. Harless,* 176 N.C.App. 402, 406, 626 S.E.2d 755, 757–58 (2006); *see also Boyce v. McMahan,* 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974) ("[An] offer to contract leaving material portions open for future agreement is nugatory and void for indefiniteness.").

"Price, along with identification of the parties and the property to be sold, are the essential elements of a contract" for the sale of land. *Connor,* 176 N.C.App. at 405, 626 S.E.2d at 757; *see also River Birch Assocs. v. City of Raleigh,* 326 N.C. 100, 123, 388 S.E.2d 538, 551 (1990) ("The essential terms of a contract for conveyance of land are the names of the grantor and grantee, the price or consideration, and a description of the property to be sold."). There is no requirement that the option contain a sum certain price; however, there must be an agreement of the parties upon this essential term of the contract, definite within itself or capable of being made definite. *Horton v. Humble Oil & Refining Co.,* 255 N.C. 675, 122 S.E.2d 716 (1961). "Where a contract sets the method for determining the price or costs and the costs are determined according to that method, the contract is complete and sufficiently definite in that respect." *Brawley v. Brawley,* 87 N.C.App. 545, 550, 361 S.E.2d 759, 762 (1987).

The Lease at issue refers to "CPI," which is not defined in the contract. There appears to be agreement, however, that "CPI" refers to "Consumer Price Index." (*See* Paul Broyhill Dep. 31:6–22, Smith Dep. 13:8–15:2.) A problem arises because there is more than one such index. Thus, to the extent that there was no agreement about which CPI figure to use, there was no agreement as to purchase price.

With respect to which CPI figure was to be used, Paul Broyhill deposed that PB Realty always used the same figure. Some relevant portions of his deposition are as follows:

Q. And what is the CPI?

A. That's a good question. That's a figure that's computed by more than one group which is supposed to indicate the rate of inflation. I don't happen to agree with it. I don't think it adequately does it. But on the other hand that's the figure that we commonly use in real estate.

Q. What CPI measure did you intend for this lease to be governed by?

A. You know, we have used a specific one, and I would have to ask someone to find out which one that is. I don't know the exact one. I know there are several, and that's the whole point. You could disagree about which CPI to use.

Q. But you have always used the same one?

A. As far as I know, we've always used the same one.

Q. In all your leases?

A. Yes.

(Paul Broyhill Dep. 31:5–31:22.) Smith deposed that he was unaware more than one consumer price index existed:

Q. At the time that you entered into the lease, what did CPI mean to you?

A. Consumer Price Index.

Q. Did you have any way of determining what that number was at the time you entered into the lease?

A. No. Maybe I should correct that. I probably had a way. I didn't have a need. When I had a need, I went to the computer and looked it up. When I needed it, I looked it up.

Q. Okay. And the way you looked it up was to get on the internet?

A. Yes, that's correct.

Q. And at this point, you're unaware of what particular index you were looking at when you looked up the CPI?

A. I programmed in "Consumer Price Index," and I guess that one came up. I didn't know there were different Consumer Price Indexes.

Q. Okay.

A. And the computer didn't ask me which one. It just said, "Consumer Price Index."

Q. Okay. Do you have any record of what internet website you went to when you attempted to determine the CPI?

A. No.

(Smith Dep. 14:2–15:2.)

Several other pieces of evidence concern the appropriate CPI figure to use, though the parties dispute the relevance and admissibility of this evidence. Hunt Broyhill, Paul Broyhill's son, also provided some evidence at his deposition regarding the appropriate CPI figure to be used.[3] He deposed as follows:

Q. Well, let's look at Exhibit 7. If you would look on page two of this lease, which is a lease with PB Realty and Health Quest One, Inc., over on page two of section four also refers to CPI, correct?

A. Yes, sir.

Q. And if you would look at Exhibit 9 which is a lease agreement between PB Realty, Inc, and Island Solutions, Plus, Inc., at the bottom of page one under section four also refers to CPI, correct?

A. Okay, that is correct.

Q. Were you here when your father testified earlier today that P.B. Realty consistently uses one measure of CPI?

A. I think I was out of the room.

Q. Do you agree with that statement that P.B. Realty consistently uses one measure of CPI?

A. No, sir.

Q. What about that statement do you not agree with?

A. Because there—I think there are— I think there is a Wall Street Journal CPI which is probably conventional, but I know that there's more than one CPI. So an escalation would have to be agreed upon, agreed upon by the tenant and the landlord.

. . .

Q. What did P.B. Realty intend when it inserted the term CPI into this lease?

---

**3.** According to Plaintiff, Hunt Broyhill's deposition testimony is irrelevant to determining what CPI the parties agreed upon in this case. Hunt Broyhill deposed that he did not negotiate directly with Steve Smith concerning this lease. (Hunt Broyhill Dep. 21:11–21:13.) He also had no recollections of discussing this particular lease with his father or with anyone else. (Hunt Broyhill Dep. 21:13–21: 24.)

A. I don't think I—let's see who the parties to the lease are. . . .

. . .

Q. Let's look at Exhibit 3.

A. All right.

Q. What measure of CPI was intended by Exhibit 3?

A. I do not know.

Q. So it is your testimony that the CPI varies from tenant to tenant?

A. I'm not saying that the CPI varies from tenant to tenant. I'm saying that there's more than one measure of CPI.

Q. And what I'm asking—I'm sorry, go ahead.

A. And the tenant and the landlord, as I've already testified, would have to be in agreement.

Q. And would that agreement occur when the lease was executed?

A. It certainly could but it is common practice in the real estate industry that once a lease is sufficiently out in time the CPI escalations come into play instead of—it's a way for a lease to address, you know, long-term escalations into the future when we don't know what interest rates are and we don't know what other economic factors are that could either be advantageous or disadvantageous to the tenant or the landlord. It's an agreed-upon convention of fairness to both parties. Now, assuming that time period passed and a tenant and landlord wanted to exercise those options, they would probably agree to a CPI—CPI figure that was pertaining to them at that time. Conversely, could you—the question you asked m[e] is could you define that CPI at the beginning of the lease? You absolutely could and it's probably a better idea, probably later forms of leases we should but it clearly was not done here.

Q. But the CPI that P.B. Realty used did not vary from tenant to tenant, did it?

A. You've already had my testimony to that.

Q. And again, I'm asking for a yes or no answer and I haven't gotten a yes or no answer. . . .

A. My answer is there are various CPIs and I don't think that in the minutes of P.B. Realty we have defined there is a specific CPI that we would use in this eventuality every single time.

Q. Is there a practice within P.B. Realty whether or not it is memorialized anywhere?

A. Not to my knowledge.

(Hunt Broyhill Dep. 29:3–32:8.) Later in his deposition, Hunt Broyhill stated that PB Realty has "never disputed" that "Steve . . . had an option." (Hunt Broyhill Dep. 55:5–55:8.)

■ Boyd Wilson, who has served as the vice president of PB Realty since July of 2005, deposed that PB Realty customarily uses the "Urban" Consumer Price Index. (Wilson Dep. 6:12–6:18, 20:1–20:6.) PB Realty asserts Plaintiff's reliance on Wilson's testimony is "misplaced" because he did not become employed with PB Realty until 2005, and "his testimony reflects no knowledge of the Defendant's practices or transactions at the time the lease was entered into with the Plaintiff in 1996." (Def.'s Resp. in Opp'n at 12.) Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C–1, Rule 401. While it is true that Wilson cannot testify as to the events surrounding the execution of the Lease, his testimony is relevant, especially in light of Paul Broyhill's testimony that PB Realty uses one figure for CPI. Wilson's testimony sheds some light upon the meaning of "CPI," a term PB Realty uses in all of its leases.

■ The other block of evidence concerning which CPI figure was intended comes in the form of Miller's deposition testimony. Miller deposed that he has been practicing law in Charlotte, North Carolina, since 1978. (Miller Dep. 9:7–9:20.) The focus of his legal practice is commercial and residential real estate, and he also practices corporate law. (Miller Dep. 9:22–10:1.) An excerpt from his deposition testimony follows:

Q. The phrase "CPI," in the language that you just read, does that have any meaning to you, just based on what you've read?

A. Yes.

Q. What would that meaning be?

A. It means Consumer Price Index.

Q. Are you familiar with the Consumer Price Indexes?

A. Yes, uh-huh.

Q. Is it fair to say that there is more than one CPI?

A. I think by federal regulation there's more than one, but in the commercial real estate business there's typically one.

Q. What would that be?

A. I don't know if I can describe it in words to you, but among commercial real estate property managers there's one Consumer Price Index that's used, and it's contained in the leases that describes it. And I don't know if I can repeat for you what it says in a commercial lease, but there's one commonly used on commercial leases.

Q. But you're not aware of the specific designation of that particular CPI, in the whole host of CPIs that exist?

A. I'd have to pull up a lease and show it to you because there's language in there about Bureau of Labor statistics and Department of Labor, and such and such.

Q. Okay. However, you don't see any language identifying the CPI to be used in the language that you just read?

A. I think real estate people would recognize that "CPI" meant that index that's used in commercial real estate.

Q. But on the four corners of the document, the only reference that's made is to "CPI."

A. "CPI" is what it says, but that's commonly accepted to mean the consumer price index that is used in the commercial real estate market.

Q. Do you know if the commonly accepted CPI used in 1996 in the commercial real estate market is the same that's used today?

A. To my knowledge, it is, yes.

(Miller Dep. 23:18–25:16.) In a declaration filed on December 10, 2007, Miller indicated that the "one such index" he referred to in his deposition testimony is the United states Department of Labor Bureau of Labor and Statistics Consumer Price Index for All Urban Consumers (CPI–U). (Miller Decl. ¶¶ 3–4.)

PB Realty argues Miller's testimony is not admissible because it is not based on personal knowledge. No one asserts that Miller has personal knowledge of the negotiations in this case, as he was not representing Smith at the time the Lease was signed. PB Realty asserts that his declaration is an "attempt to submit his testimony as an expert, even though he has not been identified as an expert witness or submitted a report as required under Rule 26." (Def.'s Resp. in Opp'n at 14.) PB Realty continues, "Here, the testimony concerning CPI contained in Miller's Declaration constitutes expert testimony as it relates to the specialized field of commercial lease negotiation, preparation and valuation, and includes assertions about what is 'typical' for such transactions." (Id.) PB Realty argues that because Miller was not

disclosed as an expert, the court should exclude his testimony. (*Id.*) SE Cinema responds that it did not list Miller as an expert because it had no intention of proffering him as an expert; it intended to offer Miller as a fact witness regarding the steps SE Cinema took to exercise the option. (Pl.'s Reply at 6.) However, PB Realty questioned Miller regarding his education, experience, and certifications, and it asked Miller "numerous hypothetical questions calling on him to render opinions on issues of real estate and contract law." (*Id.*) SE Cinema argues that PB Realty "opened the door" to this testimony, and that even if SE Cinema should have disclosed him as an expert, his testimony should not be excluded because the failure to disclose is harmless. (*Id.* at 6–7.)

Under Federal Rule of Civil Procedure 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless ..." The court exercises its discretion and will consider Miller's testimony. Miller has worked in commercial real estate for over twenty years, so he has knowledge concerning what "usually" occurs in a real estate transaction. Furthermore, PB Realty did, as SE Cinema asserts, inquire as to Miller's educational background and his experience, and it did pose a number of hypotheticals to Miller. PB Realty cannot claim "surprise" given that Miller's deposition occurred on October 11, 2007, and at that point, PB Realty was aware of Miller's testimony that one specific CPI is typically used in commercial real estate transactions. PB Realty argued at the hearing that it did not have notice of Miller's opinion at the time of his deposition, and the court finds that argument somewhat disingenuous. It is true that Miller did not specifically state during his deposi-

tion that CPI–U is the index typically used in commercial real estate transactions. However, PB Realty was certainly aware of his opinion that there was in fact *one* CPI that was used in these types of transactions. All Miller has done in the interim between his deposition testimony and today is put a name on the index he identified during his deposition testimony. Accordingly, the court exercises its discretion and considers this evidence. *See Michelone v. Desmarais,* 25 Fed.Appx. 155 (4th Cir.2002) (concluding there was no error in admitting defendant's expert testimony despite failure to provide the plaintiff with a timely expert witness report when the plaintiff knew the identity of the expert and knew why he opined the defendant acted within the standard of care); *Proctor v. Tsao,* 164 F.3d 625 (4th Cir.1998) (unpublished table decision) (concluding the district court did not abuse its discretion in allowing certain portions of expert's testimony that were not disclosed in the Rule 26 report because the defendant had sufficient notice of the nature and bases of the testimony and because any failure to comply with Rule 26 was harmless); *see also Hester v. CSX Transp., Inc.,* 61 F.3d 382, 388 n. 11 (5th Cir.1995) (trial court's decision refusing to exclude expert's rebuttal testimony was not an abuse of discretion even though opinion was not disclosed until day of trial where court finds no intent to withhold opinion in effort to obtain unfair advantage).

In light of all this evidence, the court concludes there is no genuine issue of material fact concerning whether the option is valid. The court denies PB Realty's Motion for Summary Judgment on this issue and grants SE Cinema's motion. The option is valid, and CPI–U must be used to determine the option purchase price. Smith deposed he was only aware of one consumer price index, and Paul Broyhill deposed that PB Realty used one such

figure, though he could not call it by name. Boyd Wilson deposed that PB Realty uses the CPI–U figure, and SE Cinema concurs that this is the appropriate CPI figure. Miller, having practiced commercial real estate law for over twenty years, deposed that CPI–U is the figure used in commercial real estate transactions. And even Hunt Broyhill's deposition testimony did not indicate the CPI varied from tenant to tenant; he stated, "I'm not saying that the CPI varies from tenant to tenant. I'm saying that there's more than one measure of CPI." To say that there is more than one measure of CPI is not to say that PB Realty used different measures of CPI in its leases. To follow Defendant's argument to its logical conclusion, it seems PB Realty is asserting it has a "back door" escape clause in all of the leases it drafted, such that no tenant will ever be able to exercise an option to purchase or renew because the parties never agree on a CPI at the time the contract is signed. The court finds such a position untenable. PB Realty drafted this lease and has used similar terms in its leases with other tenants. Furthermore, there has been no suggestion that any figure other than CPI–U is what was intended. Accordingly, the court grants SE Cinema's motion for summary judgment with respect to the validity of the option.

### B. Whether the Option Was Exercised

▪ In the court's order dated April 12, 2007, the court determined that under the facts alleged in the complaint, SE Cinema timely and effectively exercised the option. In now considering the evidence, the court concludes that the option was indeed properly exercised.

▬ Under North Carolina law, an option in a lease, which gives the lessee the right to purchase the leased premises at any time before the expiration of the lease, is a continuing offer to sell on the terms set forth in the option, and may not be withdrawn by the lessor within the time limited. *Crotts v. Thomas*, 226 N.C. 385, 387, 38 S.E.2d 158, 159–60 (1949). As such, while an option is not a contract to sell, it is transformed into one upon acceptance by the optionee in accordance with its terms. *Kidd*, 289 N.C. at 352, 222 S.E.2d at 399 (citing *Lawing v. Jaynes*, 285 N.C. 418, 206 S.E.2d 162 (1974)). An acceptance by the optionee must be in accord with all the terms specified in the option; however, where the option does not specify the manner in which it should be exercised, any form of timely notice of the optionee's unqualified acceptance serves to create a binding contract of sale. *Kottler v. Martin*, 241 N.C. 369, 85 S.E.2d 314 (1955) ("The 'exercise' of an option is merely the election of the optionee to purchase the property ... [and] may be exercised or accepted orally unless the contract requires a written acceptance."); *Rice v. Wood*, 91 N.C.App. 262, 264, 371 S.E.2d 500, 502 (1988) ("On the other hand, the option may merely require that notice be given of the exercise thereof during the term of the option."); 60 Am.Jur. Proof of Facts 3d § 255.

As the court noted in its earlier order, the option in the case *sub judice* does not specify the manner in which the option is to be accepted, and as a result, SE Cinema could accept any time prior to August 1, 2006, simply by giving notice to PB Realty of its intent to exercise the option. (Order at 8.) The court concluded the May 19, 2006 letter was a sufficient manifestation of SE Cinema's determination to exercise the option. *See Pearson v. Millard*, 150 N.C. 303, 63 S.E. 1053 (1909) (holding that an optionee's statement that he "wanted to avail himself of the right to purchase under his contract" was sufficient to exercise the option).

PB Realty again makes the argument that there is a question of fact regarding whether the May 19, 2006 letter was an effective exercise of the option. PB Realty points to a February 2002 letter, arguing that the May 19, 2006 letter was no more definite than the February 2002 letter and that Miller testified the February 2002 letter was not an exercise of the option but merely a "heads up" and request for information. (Miller Dep. 50:7–50:51:9.) This letter was from Miller to PB Realty and stated that Miller represented Smith "with respect to his intent to exercise his option." Miller deposed this letter "was a request for information and to notify [PB Realty] that Steve Smith was considering buying the building." (Miller Dep. 50:15–50:17.) At his deposition, Miller said this with respect to the May 19 letter:

Q. Why was the letter sent on May 19?
A. Based upon the document you gave me dated November with Home Depot, I've known from past experience that when you're dealing with a company like Home Depot or any large developer that the closing date is way in the future. So all that was preliminary. As we got to May, we were getting close to the time when we had to take certain actions to proceed on.
So the letter of May 19 was to solicit certain information from Mr. Broyhill and to give him heads up that we were going to exercise the option once we got the information to calculate the price.

(Miller Dep. 66:18–67:5.)

Based on Miller's deposition testimony (which the court would not have considered in ruling on the 12(b)(6) motion), it appears SE Cinema did not intend this letter to exercise its option. Even if the court considers this testimony (which seems to contradict the language written in the letter itself), such a consideration changes nothing, given that if the May 19 letter was not an exercise of the option,

the option was clearly exercised by the letter of July 13, 2006. The July 13 letter indicated that Miller wanted to be sure SE Cinema did not miss the deadline for exercising the option, and it also states, "I would suggest that this letter will constitute our exercise of the option." Plaintiff could not have stated that it wished to, and in fact was, exercising the option with any more clarity than it did. PB Realty argues that there is a question of fact regarding whether this letter was an effective exercise of the option. PB Realty argues this letter "includes language which conditions the exercise of the option upon 'leeway' for closing by the end of the year, and requests that Mr. Broyhill sign the letter and return it indicating his agreement to extend the closing date until the end of the year." (Def.'s Resp. in Opp'n at 19.)

■ PB Realty is correct in its assertion that "[i]f the acceptance contains material conditions not included in the offer, such purported acceptance constitutes a counter proposal which the other party is not bound to accept." *Ferguson v. Phillips*, 268 N.C. 353, 355, 150 S.E.2d 518, 521 (1966). However, the fact that the July 13 letter asked for leeway with respect to a closing date does not mean that SE Cinema, in tendering that letter, varied the terms of acceptance; rather, this request is an incidental one. Nowhere in that letter did SE Cinema suggest that it would not be exercising its option if PB Realty did not agree to give it "leeway" on a closing date, and in any event, PB Realty had agreed to close by the end of the year. Miller deposed that Smith was ready to purchase the property on May 19 and that had PB Realty wanted to close within thirty days, Miller would have been able to do so. (Miller Dep. 67:13–67:22.) As the Supreme Court of North Carolina stated in *Kidd,*

Since an option is a binding contract, it is not revocable by the optionor within the stated option period, and subsequent negotiations which do not result in an agreement to vary the terms of the option, will not constitute a rejection of it. The optionee is not bound to accept the offer contained in the option, but his right of acceptance continues during the option period.

*Kidd,* 289 N.C. at 360, 222 S.E.2d at 404. PB Realty makes much of the fact that a December 31, 2006 closing date was of importance to SE Cinema. However, PB Realty had already agreed to that closing date, and the letter does not state that Plaintiff's exercise of the option is conditioned upon a certain date for closing.

 PB Realty also makes much of the fact that the August 25, 2006 proposed contract was inconsistent with the terms of the option. The August 25 proposed contract is not relevant because the option was exercised *at the latest* on July 13, 2006. As this court noted in its earlier order, evidence of negotiations of the terms of sale after acceptance of the option do not disturb the enforceability of the contract created upon acceptance. *See Yaggy v. B. V.D. Co.,* 7 N.C.App. 590, 593, 173 S.E.2d 496, 498 (1970) (holding that, where party accepted written offer containing all material terms, the fact that parties disagreed over the drafting of a written document embodying all the terms agreed upon did not invalidate the contract formed by the memorandum of an agreement for sale). Furthermore, to the extent PB Realty is arguing that SE Cinema failed to exercise the option because it failed to tender any purchase money and failed to enter into a written contract by August 1, 2006, such argument is without merit. "Whether tender of the purchase price is necessary to exercise an option depends upon the agreement of the parties

as expressed in the particular instrument." *Kidd v. Early,* 289 N.C. at 361, 222 S.E.2d at 405. If the option requires payment of money to accompany the optionee's election to exercise the option, payment must be tendered before a contract to sell is formed. *Id.* at 361, 222 S.E.2d at 405. "On the other hand, the option may merely require that notice be given of the exercise thereof during the term of the option." *Id.* at 361, 222 S.E.2d at 405. As previously noted, because the Lease was silent, SE Cinema was free to exercise the option by merely providing notice, which it did. There was no requirement that money be paid or a written contract be drawn before the option could be exercised.

Having considered all the evidence in the record, the court concludes that there is no genuine issue of material fact regarding whether the option was exercised, and the court thus grants Plaintiff's Motion for Summary Judgment on this issue.[4]

### C. Breach of Contract

 Plaintiff also moves for partial summary judgment on its breach of contract claim on the issue of liability alone. Under North Carolina law, the elements of a claim for breach of contract are "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill,* 138 N.C.App. 19, 26, 530 S.E.2d 838, 843 (2000) (citing *Jackson v. Cal. Hardwood Co.,* 120 N.C.App. 870, 871, 463 S.E.2d 571, 572 (1995)). The court has already determined that the option contract was valid and that Plaintiff properly exercised that option, and it is undisputed that PB Realty has refused to convey the property. The court thus grants Plaintiff's Motion for Partial Summary Judgment on its breach of contract claim on the issue of liability.

---

**4.** The court does not reach the parties' arguments concerning equitable estoppel.

770

## CONCLUSION

It is therefore **ORDERED,** for the foregoing reasons, that Plaintiff SE Cinema's Motion for Summary Judgment is **GRANTED.** It is also **ORDERED** that Plaintiff's Motion for Partial Summary Judgment is **GRANTED.** It is further **ORDERED** that Defendant PB Realty's Motion for Summary Judgment is **DENIED.**

**AND IT IS SO ORDERED.**