Child Care Inc. v. LJ Schs. (Carolina), Inc., 2026 NCBC 8.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV008443-590

CHILD CARE INC.; EARLY
CHILDHOOD SERVICES INC.; DAY
CARE INC.; CHILD
DEVELOPMENT INC.; CHILD
LEARNING PROGRAMS INC.; SAM
NEWELL CHILD DEVELOPMENT,
LLC; SOUTH POINT CHILD
DEVELOPMENT LLC; RUBEN
LINKER CHILD DEVELOPMENT
CENTER LLC; and MONROE ROAD
CHILD DEVELOPMENT CENTER
LLC,

Plaintiffs,

v.

LJ SCHOOLS (CAROLINA), INC.,

Defendant.

**ORDER AND OPINION ON
PLAINTIFFS' AND DEFENDANT'S
MOTIONS FOR SUMMARY
JUDGMENT**

1. **THIS MATTER** is before the Court upon Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") filed on 21 April 2025 and Defendant's Motion for Summary Judgment ("Defendant's Motion") filed on 18 April 2025 pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Rule(s)"), in the above captioned case.[1]

2. Having considered Plaintiffs' Motion and Defendant's Motion, the parties' briefs and materials offered in support of and in opposition to each Motion, the arguments of counsel at the hearing on the Motions, and other appropriate matters

---

[1] (Pls.' Mot. Summ. J. [hereinafter, "Pls.' MSJ"], ECF No. 45; Def.'s Mot. Summ. J. [hereinafter, "Def.'s MSJ"], ECF No. 40.)

of record, the Court hereby **GRANTS Defendant's Motion** and **DENIES Plaintiffs' Motion**.

> *Shumaker, Loop & Kendrick, LLP, by Steven A. Meckler and Frederick M. Thurman, for Plaintiffs Child Care Inc., Early Childhood Services Inc., Day Care Inc., Child Development Inc., Child Learning Programs Inc., Sam Newell Child Development, LLC, South Point Child Development LLC, Ruben Linker Child Development Center LLC, and Monroe Road Child Development Center LLC.*

> *Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., by Evan M. Sauda, for Defendant LJ Schools (Carolina), Inc.*

Brown, Judge.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

3. While the Court does not make findings of fact on a motion for summary judgment, "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161-62 (2010) (citation and quotation marks omitted). Accordingly, the following background, drawn from the undisputed evidence submitted by the parties, is intended only to provide context for the Court's analysis and ruling and not to resolve issues of material facts.

4. Plaintiff Child Care Inc. and the other eight Plaintiffs are each a North Carolina corporation or a North Carolina limited liability company.[2] Kevin Campbell was the manager and principal of each of the Plaintiff entities before their

---

[2] (Verified Compl. ¶ 1–9, ECF No. 3.)

dissolutions.[3]   Together, Plaintiffs owned and operated nine childcare centers in South Carolina and North Carolina.[4]

5.      Defendant LJ Schools (Carolina), Inc. ("LJ Schools") is a North Carolina corporation that owns and operates daycare facilities in the State of North Carolina.[5]

6.      On 24 December 2020, Plaintiffs and Defendant entered into an Asset Purchase Agreement (together with the later Amending Agreement dated 30 September 2021, the "APA"), whereby Defendant purchased childcare facilities and other assets from Plaintiffs.[6]

7.      Under the APA, the total "Purchase Price" consists of three components: $10,750,000.00 on the closing date, $250,000.00 as a "Holdback Amount," and a "Contingent Payment" not to exceed $6,000,000.00.[7]

8.      The parties' dispute centers on whether Plaintiffs have earned the Contingent Payment.   The APA provides that the Contingent Payment shall be calculated using the following formula:

6 x Purchased Assets' rolling 12-month EBITDA less $11,310,696.00.[8]

---

[3] (Verified Compl. ¶ 18; Answer and Affirmative Defense of Def. LJ Schools (CAROLINA), Inc. [hereinafter, "Answer"] ¶¶ 1–9, ECF No. 7; Tr. Hr'g Mots. Summ. J. [hereinafter, "Tr. Hr'g"] at 4:21, ECF No. 53.)

[4] (Mem. Law Supp. Def.'s Mot. Summ. J. [hereinafter, "Mem. Supp. Def.'s MSJ"] 2, ECF. No. 41.)

[5] (Verified Compl. ¶¶ 10–11.)

[6] (*See* Verified Compl., Ex. A – Asset Purchase Agreement [hereinafter, the "APA"]; Verified Compl., Ex. A – Amending Agreement [hereinafter, the "Amending Agreement"].)

[7] (Verified Compl. ¶ 27; APA § 4.2.)  Each of these terms is defined in the APA.

[8] (Verified Compl. ¶ 28; APA § 4.2(c); Amending Agreement.)

9.    The APA required Defendant to prepare quarterly statements of Purchased Assets' rolling 12-month EBITDA during an earn out period (the "Earn Out Period"), using the following formula:

> Total Revenue *less* Non-Recurring Revenue *less* Center Level Personal [sic] Costs *less* Operating Costs *less* Fixed Costs *less* Dues and Taxes *less* Overheard [sic] Costs *plus* (Non-Recurring Revenue × 12%).[9]

10.    Under the APA, "Non-Recurring Revenue" and several other variables are defined, and Defendant has sole discretion to determine the specific variables in the above formulas:

> For greater certainty, the specific variables associated with each of the above formula (including the application of the term EBITDA) in the equation shall be determined by [Defendant] in its *sole discretion. Without limiting the above in any way*, the parties agree to the following principles.
>
> . . .
>
> *Non-Recurring Revenue* in the above equation in Section 4.2.c.iii shall include all grants, payments for non attending [sic] children, or government stimulus funds received by [Defendant] that are *free of mandated expense obligations* by the grantor or administrator of such funds during the Earn Out Period.[10]
>
> (emphasis added).

The APA does not, however, define "mandated expense obligations."

[9] (Verified Compl. ¶ 29; APA § 4.2(c); Amending Agreement.)  The "Earn Out Period" is defined in the APA § 4.2(c)(iii) and later amended by the Amending Agreement to be the period "commencing on March 31, 2022 and continuing to March 31, 2023."

[10] (APA § 4.2(c)(iii).)  During the negotiations leading up to the execution of the APA, the parties discussed at arms-length the definition of Non-Recurring Revenue, the calculation of Contingent Payment, and the treatment of government stimulus grants free of mandated expense obligations.  *See* Mem. Supp. Def.'s MSJ 6–8.  Ultimately, they agreed on the above formulas and inserted a merger clause into the APA.  *See* Mem. Supp. Def.'s MSJ 8; APA § 14.6.

11. The APA also imposes on Defendant a duty to "use reasonable commercial efforts and operate in good faith so as to maximize EBITDA of the [b]usiness during the Earn Out Period."[11]

12. During the Earn Out Period, Defendant received Early Childhood Stabilization Grants from the State of North Carolina and similar grants from the State of South Carolina (collectively the "Grant Funds").[12] These Grant Funds were provided by the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4 (2021), enacted by Congress in 2021 in response to the ongoing COVID-19 pandemic.[13] The North Carolina Division of Child Development and Early Education, the agency responsible for distributing the ARPA Grant Funds, separated the Grant Funds into two categories: the Compensation Support Grants and the Fixed Costs and Families Grants.[14] Plaintiffs' entitlement to the Contingent Payment depended heavily on whether the Grant Funds were categorized as Non-Recurring Revenue, because Non-Recurring Revenue was deducted from Total Revenue under the EBITDA formula.

---

[11] (APA § 9.7.)

[12] (*See* Verified Compl. ¶¶ 42–43; Mem. Supp. Def.'s MSJ 8–11, 16–20.)

[13] (Br. Supp. Pls.' Mot. Summ. J. [hereinafter, "Br. Supp. Pls.' MSJ"] 6–7, ECF No. 46.)

[14] (*See* Ex. 23, p. 2, ECF 43.7: "Each approved program receives a **fixed costs and families grant** . . . . Programs may choose to also receive additional funding, **compensation supports grants** . . . . The two components . . . .".)

13. No later than August 2022, the parties began to disagree on Defendant's categorization of the Grant Funds under the EBITDA formula.[15] The parties' disagreement stems from their different views on whether the Grant Funds are free of mandated expense obligations by the grantor or the administrator of such funds and thus deemed Non-Recurring Revenue when calculating EBITDA and the Contingent Payment.[16]

14. Plaintiffs contend that the Grant Funds are not free of mandated expense obligations and should be included as recurring revenue for the Contingent Payment calculation.[17] Defendant agrees with Plaintiffs that the Compensation Support Grants are not free of mandated expense obligations, but claims that the Fixed Costs and Families Grants are free of mandated expense obligations and thus Non-Recurring Revenue.[18]

15. On 7 July 2023, Plaintiffs notified Defendant of their election to have the Contingent Payment calculated and paid to Plaintiffs.[19] The results of the calculation from the two parties were drastically different: Plaintiffs calculated the Contingent

---

[15] (*See* Mem. Supp. Def.'s MSJ 12; *see also* Ex. 29, ECF No. 43.13, Ex. 30, ECF No. 43.14.)

[16] (Verified Compl. ¶ 42.) It is apparent from the formulas that the greater the Non-Recurring Revenue is, the smaller the outcome of Purchased Assets' rolling 12-month EBITDA, and thus the Contingent Payment, will be.

[17] (*See* Verified Compl. ¶¶ 42–63.)

[18] (*See* Mem. Supp. Def.'s MSJ 8–12; *see also* Ex. 29, ECF No. 43.13, Ex. 30, ECF No. 43.14.)

[19] (Ex. 32, ECF No. 43.16.)

Payment to be the full $6,000,000.00, while Defendant calculated the Contingent Payment to be zero.[20]

16. The parties could not resolve the dispute among themselves.[21] Consequently, pursuant to Section 4.2(c)(vii) of the APA,[22] Plaintiffs and Defendant each appointed qualified accountants to determine the disputed aspects of the Contingent Payment.[23] The accountants were unable to agree on the amount of the Contingent Payment.[24]

17. On 20 February 2024, Plaintiffs filed their Verified Complaint, asserting three claims.[25] First, Plaintiffs allege that Defendant breached the APA by (a) failing to pay the Contingent Payment in the amount of $6,000,000.00, (b) failing to properly categorize revenue, costs, and expenses for the purpose of calculating the Contingent Payment, and (c) failing to act in good faith to maximize EBITDA during and related to the Earn Out Period.[26] Second, Plaintiffs allege that Defendant breached the duty

---

[20] (Verified Compl. ¶ 36; Mem. Supp. Def.'s MSJ 12–13.)

[21] (Verified Compl. ¶ 38.)

[22] (APA § 4.2(c)(vii): "If the [parties] disagree on any aspect of the Contingent Payment including the Quarterly EBITDA Statement . . . and the parties are unable to resolve such dispute within 20 days, then each of [sic] Party shall appoint a qualified Chartered Accountant, both of whom shall work together in good faith to finally determine the disputed aspects of the Contingent Payment. The Parties agree to be bound by the determination of the Chartered Accountant in this regard.".)

[23] (Verified Compl. ¶ 39.)

[24] (Verified Compl. ¶ 41.)

[25] (Verified Compl.)

[26] (Verified Compl. ¶¶ 67–80.)

of good faith and fair dealing imposed by § 9.7 of the APA by failing to act in good faith to maximize EBITDA and the Contingent Payment to be received by Plaintiffs.[27] Third, Plaintiffs seek a declaration that (a) the Grant Funds are not free from mandated expense obligations by the grantor or administrator of such funds during the Earn Out Period, and (b) the Grant Funds are to be included as recurring revenue for purposes of the EBITDA calculation, the Contingent Payment, and other relevant calculations.[28]

18. Defendant filed its Answer and Affirmative Defenses on 22 March 2024, denying liability for the causes of action asserted by Plaintiffs.[29]

19. Defendant filed its Motion for Summary Judgment on 18 April 2025, seeking summary judgment as to all of Plaintiffs' claims.[30] Plaintiffs filed their Motion for Summary Judgment on 21 April 2025, seeking summary judgment in their favor on all claims.[31] After full briefing, the Court held a hearing on Plaintiffs' Motion and Defendant's Motion on 30 July 2025 (the "Hearing"), at which all parties were represented by counsel. The Motions are now ripe for resolution.

---

[27] (Verified Compl. ¶¶ 81–85.)

[28] (Verified Compl. ¶¶ 86–95.)

[29] (Answer.)

[30] (Def.'s MSJ.)

[31] (Pls.' MSJ.)

## II.

## LEGAL STANDARD

20. Under Rule 56(c), "[s]ummary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Da Silva v. WakeMed*, 375 N.C. 1, 10 (2020) (quoting N.C. R. Civ. P. 56(c)). "A genuine issue of material fact is one that can be maintained by substantial evidence." *Curlee v. Johnson*, 377 N.C. 97, 101 (2021) (cleaned up). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681 (2002) (cleaned up). "An issue is material if, as alleged, facts 'would constitute a legal defense, or would affect the result of the action or if its resolution would prevent the party against whom it is resolved from prevailing in the action.'" *Bartley v. City of High Point*, 381 N.C. 287, 292 (2022) (quoting *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518 (1972)). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." *Belmont Ass'n v. Farwig*, 381 N.C. 306, 310 (2022) (quoting *Dalton v. Camp*, 353 N.C. 647, 651 (2001)).

21. "The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002). The movant may meet this burden either

(1) "by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense," or (2) "by showing through discovery that the opposing party cannot produce evidence to support an essential element of [its] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (cleaned up). If the movant meets its burden, "the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating that the nonmoving party will be able to make out at least a prima facie case at trial[.]" *Cummings v. Carroll*, 379 N.C. 347, 358 (2021) (cleaned up); *see also* N.C. R. Civ. P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

22. "For affirmative summary judgment on a party's own claim, the burden is heightened." *Futures Grp. v. Brosnan*, 2023 NCBC LEXIS 7, at *4 (N.C. Super. Ct. Jan. 19, 2023). The movant "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985); *accord Kidd v. Early*, 289 N.C. 343, 370 (1976). Consequently, "rarely is it proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984).

## III.

## ANALYSIS

23.   As an initial matter, the only issue before the Court is the amount of a "Contingent Payment" Plaintiffs are entitled to under the APA, which is wholly dependent upon the interpretation of the term "mandated expense obligations" in the APA.[32]   Defendant contends that certain grants it received during COVID, namely the Fixed Costs and Families Grants, are free of mandated expense obligations and thus are Non-Recurring Revenue; therefore, they would be excluded from revenue and the calculation of the Contingent Payment, based on Defendant's interpretation of the term "mandated expense obligations."   Plaintiffs argue that the Fixed Costs and Families Grants clearly carry "mandated expense obligations" and therefore should be deemed recurring revenue under the APA.

24.   The parties agree that there are no genuine issues of material facts or factual disputes in this case.[33]   The only material dispute involves the meaning and interpretation of a single term in the APA.

<u>Defendant's Motion</u>

25.   Defendant moves for summary judgment on Plaintiffs' breach of contract claim, claim of breach of duty of good faith and fair dealing, and claim for declaratory relief.[34]

---

[32] (Br. Supp. Pls.' MSJ 1–2.)

[33] (*See generally* Tr. Hr'g 6–9, 19–20, 34:19–25, 45–47; *see also* Br. Supp. Pls.' MSJ 3.)

[34] (Mem. Supp. Def.'s MSJ.)

## A. **Breach of Contract**

26. The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of the contract. *Davis v. Woods*, 286 N.C. App. 547, 561 (2022) (citation omitted).

27. On Plaintiffs' breach of contract claim, Defendant argues that: (1) Defendant properly exercised its contractually vested discretion in categorizing items in the EBITDA formula, including the Grant Funds; (2) the contract negotiations and due diligence establish an intent to categorize the Fixed Costs and Families Grants as Non-Recurring Revenue; and (3) Defendant operated the business with commercially reasonable efforts and in good faith.[35]

28. Plaintiffs contend that (1) Defendant's interpretation of the APA is self-serving and not a proper exercise of its contractually vested discretion, and (2) Defendant's reliance on the parties' negotiations of the APA is improper.[36]

*Are the terms of the APA clear and unambiguous?*

29. The APA is a contract. The enforceability of contracts is governed by the general principles of contract law. *Chappell v. Roth*, 353 N.C. 690, 692 (2001).

30. "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2024 NCBC LEXIS 47, at *28 (N.C. Super. Ct. July 31, 2024) (citing *Lane v. Scarborough*, 284 N.C. 407, 409–10

---

[35] (Mem. Supp. Def.'s MSJ 15–26.)

[36] (Br. Resp. Def.'s Mot. Summ. J. [hereinafter, "Br. Resp. Def.'s MSJ"], ECF. No. 47.)

(1973)). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881 (1996). "A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law." *Lane v. Scarborough*, at 410. Whether the contract is, in fact, ambiguous is a question for the court to determine. *Lynn v. Lynn*, 202 N.C App. 423, 432 (2010).

31. The APA clearly grants to Defendant sole discretion in determining the variables in the EBITDA formula and, without limiting Defendant's discretion, defines Non-Recurring Revenue to include grants free of mandated expense obligations. No competing reasonable interpretations have been advanced by either party. Neither party argues in its briefs that the terms of the APA are ambiguous with regards to the Contingent Payment formula, its calculation, the items included in the formula, or the definitions of the items. The parties' dispute is not over whether the APA grants Defendant the discretion described above, or over whether Non-Recurring Revenue should be free of mandated expense obligations. Instead, the parties' dispute involves whether Defendant's determination that the Fixed Costs and Families Grants are free of mandated expense obligations is a proper exercise of its discretion. Indeed, the parties expressly agreed during the Hearing that the APA was clear and unambiguous.[37] The Court agrees and concludes that the APA is clear and unambiguous.

---

[37] (*See* Tr. Hr'g. 19–20, 34:19–25, 43:6–8, 45–47.)

32.     When a contract is clear and unambiguous, absent allegations of fraud or mistake, its terms may not be contradicted by parol or extrinsic evidence, and it is presumed that all prior negotiations are merged into the written instrument. *Root v. Allstate Ins. Co.*, 272 N.C. 580, 587 (1968). Parol evidence may only be used to explain or supplement the contract "if it appear[s] that the entire agreement was not reduced to writing, or if the writing itself leaves it doubtful or uncertain as to what the agreement was." *Id.* at 590.

33.     The conclusion that the APA is clear and unambiguous is further supported by the APA itself and by the parties. Section 14.6 of the APA, "Entire Agreement," states that the APA constitutes the entire agreement between the parties.[38] The parties have confirmed that the APA is the result of arms-length negotiations, and the language of the APA represents the parties' intent.[39] No fraud or mistake has been alleged or found. Therefore, no extrinsic evidence will be considered by the Court for purposes of interpreting the APA.

34.     Accordingly, the Court will interpret the APA as a matter of law. The APA is clear that "the specific variable associated with" the Contingent Payment formula, including Non-Recurring Revenue, "shall be determined by [Defendant] in its sole discretion."[40]

---

[38] (APA § 14.6.) "North Carolina recognizes the validity of merger clauses and has consistently upheld them." *Zinn v. Walker*, 87 N.C. App. 325, 333 (1987).

[39] (*See generally* Tr. Hr'g.)

[40] (APA § 4.2(c)(iii).)

*Is Section 4.2(c)(iii) of the APA valid?*

35.    Despite the fact that Plaintiffs agreed to Section 4.2(c)(iii) of the APA after arms-length negotiation with Defendant, Plaintiffs argue that Section 4.2(c)(iii), which grants sole discretion to Defendant in determining the specific variables in the EBITDA formula, renders the APA illusory, because the section "reserves to [Defendant] the sole discretion to interpret the contract."[41]

36.    A contract is illusory when the promisor reserves an "unlimited right to determine the nature or extent of his performance." *Canteen v. Charlotte Metro Credit Union*, 386 N.C. 18, 26–27 (2024) (citing *State v. Philip Morris USA Inc.*, 363 N.C. 623, 641–42 (2009)).  However, a contract is not illusory if a limitation on the promisor's unlimited right is supplied by law. *Id.* at 27 ("An otherwise illusory contract may be remedied because a limitation on a promisor's freedom of choice 'may be supplied by law.'") (cleaned up).

37.    In *Canteen*, a "Notice of Amendments" provision was included in the contract at issue, which stated that "[e]xcept as prohibited by applicable law, [defendant] may change the terms of this Agreement." *Id.* at 20.  The *Canteen* Court determined that the phrase "except as prohibited by applicable law" in the contract implicates the implied covenant of good faith and fair dealing, which remedies any purported issues of illusoriness in the contract. *Id.* at 27.

38.    In *Mezzanotte v. Freeland*, 20 N.C. App. 11, 17 (1973), the Court of Appeals similarly concluded that "[a] promise conditioned upon an event within the promisor's

---

[41] (Br. Resp. Def.'s MSJ 3–4.)

control is not illusory if the promisor also 'impliedly promises to make reasonable effort to bring the event about or to use good faith and honest judgment in determining whether or not it has in fact occurred.'" In *Mezzanotte*, the agreement was contingent upon the plaintiffs obtaining "satisfactory" financing from a bank. *Id.* The term satisfactory financing was not defined in the agreement, and it was up to the plaintiffs to interpret its meaning. *See id.* at 16–17. The *Mezzanotte* Court determined that the agreement implied, and both parties understood, that "plaintiffs would make an honest good faith effort to acquire financing satisfactory to themselves" from the bank. *Id.* at 17. The *Mezzanotte* Court therefore concluded that the agreement was not illusory. *Id.*; *see also Philip Morris USA Inc.*, 363 N.C. at 641–42 (determining that the provision at issue did not render any promise illusory because "no party ha[d] an unlimited right to determine whether, or to what extent, to perform any obligation . . .").

39.    Plaintiffs argue that the APA does not contain the limiting language found in *Canteen*, and that consequently, the APA is illusory.[42] The Court finds Plaintiffs' argument unavailing.

40.    An express reference to the *implied* covenant of good faith and fair dealing is not a prerequisite for it to apply. "In addition to its express terms, in every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Governor's Club Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 251 (2002)

---

[42] (Br. Resp. Def.'s MSJ 4.)

(cleaned up); *see also Banyan GW, LLC v. Wayne Preparatory Acad. Charter Sch., Inc.*, 2019 N.C. App. LEXIS 112, at \*17–21 (N.C. Ct. App. Feb. 5, 2019) (determining that a contract was not illusory because the "sole and absolute discretion" to interpret the agreement was limited by the implied covenant of good faith and fair dealing).

41. Similar to *Canteen*, here, Defendant's discretionary power to determine the specific variables associated with the EBITDA formula carries with it the duty to exercise that power in good faith and fairly. Therefore, the Court concludes that Section 4.2(c)(iii) of the APA, which grants sole discretion to Defendant in determining the variables in the EBITDA formula, is not invalid as illusory.

*Was Defendant's exercise of discretion proper?*

42. As stated above, the parties' disagreement mainly concerns the undefined term "mandated expense obligations" and its interpretation and application. The APA is clear and unambiguous. As a matter of law, the Court interprets the APA to vest Defendant with sole discretion to determine the variables in the EBITDA formula, including Non-Recurring Revenue and the meaning of the term "mandated expense obligations." The inquiry therefore turns to whether Defendant properly exercised that discretion in interpreting the term "mandated expense obligations."

43. Defendant reads "mandated expense obligations" to mean obligations to have officially required expense.[43] Defendant interprets the term by referencing the definitions from Merriam-Webster's Dictionary.[44] Its focus is on "mandated expense."

---

[43] (*See* Mem. Supp. Def.'s MSJ 15–18.)

[44] (Mem. Supp. Def.'s MSJ 17–18.) Merriam-Webster's Dictionary defines "mandated" as "officially required," "expense" as "a financial burden or outlay," "obligate" as "to bind legally

Therefore, Defendant maintains that "mandated expense obligations" require additional expense.[45] Defendant claims that it properly exercised its discretion by excluding the Compensation Support Grant from Non-Recurring Revenue, as it obligates Defendant to pay bonuses and raises to teachers—an additional expense on top of existing wages—and by categorizing and including the Fixed Costs and Families Grants as Non-Recurring Revenue, as they do not create additional expenses and can be applied to existing or previously incurred expenses.[46]

44. Defendant also refers to Plaintiffs' previous treatment and categorization of COVID-19-related funds to support its position.[47] Defendant points out that BDO, an accounting firm hired by Plaintiffs as advisor during the due diligence period, issued a Quality of Earnings report that states: "The Company was awarded and recognized grant revenue from the state of North Carolina due to COVID-19. As

---

or morally" or "to commit (something, such as funds) to meet an obligation," and "obligation" as "something (such as a formal contract, a promise, or the demands of conscience or custom) that obligates one to a course of action" or "a commitment (as by government) to pay a particular sum of money." *Mandated*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/mandated (last visited Jan. 8, 2026); *Expense*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/expense (last visited Jan. 8, 2026); *Obligate*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/obligate (last visited Jan. 8, 2026); *Obligation*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/obligation (last visited Jan. 8, 2026).

[45] (Mem. Supp. Def.'s MSJ 18.)

[46] (Mem. Supp. Def.'s MSJ 15–18.)

[47] (Mem. Supp. Def.'s MSJ 3–4.)

these grants were nonrecurring in nature, Management proposed an adjustment to remove these revenues."[48]

46. Defendant contends that its interpretation and categorization were in good faith and should be afforded the discretion granted by the APA.[49]

46. Plaintiffs disagree with Defendant's interpretation of "mandated expense obligations" and deem Defendant's interpretation "self-serving."[50] Plaintiffs agree that "mandated" means "required,"[51] but fail to proffer an alternative interpretation of the term "mandated expense obligations."[52] Instead, Plaintiffs contend that Defendant's distinction between the Compensation Support Grant and the Fixed Costs and Families Grants is "fallacious."[53] Plaintiffs point out that the ARPA, the law that governs the Grant Funds, requires the funds to be used in a listed category of both continuing expenses and additional expenses.[54] *See* ARPA § 2202(e). The North Carolina Division of Child Development and Early Education provides that the Fixed Costs and Families Grants "must fit into one of [eight] categories of approved use."[55]

---

[48] (Ex. 26, ECF. No. 43.10.)

[49] (Mem. Supp. Def.'s MSJ 17.)

[50] (Br. Resp. Def.'s MSJ 3–6.)

[51] (Br. Resp. Def.'s MSJ 2.)

[52] (*See generally* Br. Resp. Def.'s MSJ; *see also* Br. Supp. Pls.' MSJ 6–15.)

[53] (Br. Resp. Def.'s MSJ 4.)

[54] (Br. Resp. Def.'s MSJ 4–6; Br. Supp. Pls.' MSJ 6–7.)

[55] (Br. Supp. Pls.' MSJ 6–9; Ex. 23, p. 4, ECF No. 43.7.)

47. Essentially, Plaintiffs argue that these spending requirements constitute mandated expense obligations, and since the ARPA makes no distinction between the types of grants, neither the Compensation Support Grant nor the Fixed Costs and Families Grants are free of mandated expense obligations.

48. Defendant asserts that the eight categories are non-exhaustive because childcare providers who receive the Fixed Costs and Families Grants from the North Carolina Division of Child Development and Early Education are allowed to select "Other" and to describe how the funds were utilized, in addition to the eight categories.[56]

49. Again, the parties' disagreement is rooted in their different interpretations of "mandated expense obligations."

---

The eight categories are:
(1) Rent (including rent under a lease agreement) or payment on any mortgage obligation, utilities, facility maintenance or improvements, or insurance;
(2) Personal protective equipment, cleaning and sanitization supplies and services, or training and professional development related to health and safety practices;
(3) Purchases of or updates to equipment and supplies to respond to the COVID-19 public health emergency;
(4) Goods and services necessary to maintain or resume child care services;
(5) Mental health supports for children and employees;
(6) Tuition assistance for families;
(7) Past Expenses: reimbursement of debt or expenditures incurred after January 31, 2020, for the cost of a good or service that falls in the categories above to respond to the COVID-19 public health emergency; and
(8) Personnel costs, including payroll and salaries or similar compensation for an employee (including any sole proprietor or independent contractor), employee benefits, costs for employee recruitment and retention as well as ongoing professional development or training, premium or hazard pay, staff bonuses, and employee transportation costs to or from work.

[56] (*See* Mem. Supp. Def.'s MSJ 18–19; Ex. 23, ECF No. 43.7; Ex. 24, p. 11, ECF No. 43.8.)

50. As discussed above, Defendant's discretion is limited by the implied covenant of good faith and fair dealing. To breach the implied covenant of good faith and fair dealing, Defendant must have acted in a manner, "which injured the right of the other to receive the benefits of the agreement, thus depriving the other of the fruits of the bargain." *Conleys Creek Ltd. P'ship v. Smoky Mt. Country Club Prop. Owners Ass'n*, 255 N.C. App. 236, 253 (2017) (cleaned up). "Evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance" may constitute breach of the implied covenant. *Intersal, Inc. v. Wilson*, 2023 NCBC LEXIS 29, at *67 (N.C. Super. Ct. Feb. 23, 2023) (quoting Restatement 2d of Contracts § 205 cmt. d (1981)). There is no credible evidence presented to the Court that Defendant has engaged in any such conduct.

51. Defendant followed the practice approved by North Carolina courts when interpreting undefined terms in a contract, using dictionaries. *See Morris Communs. Corp. v. City of Bessemer*, 365 N.C. 152, 158 (2011) ("To ascertain the ordinary meaning of undefined and ambiguous terms, courts may appropriately consult dictionaries.") (citations omitted); *see also James H. Q. Davis Trust v. JHD Props.*, 2022 NCBC LEXIS 153, at *11–12 (N.C. Super. Ct. Dec. 9, 2022) (using *Black's Law Dictionary*'s definition to interpret undefined term "practicable"); *Encompass Servs., PLLC v. Maser Consulting P.A.*, 2021 NCBC LEXIS 59, at *43 (N.C. Super. Ct. June 28, 2021) (using online dictionaries' definitions to interpret undefined term "server").

Defendant has presented a textually based interpretation of "mandated expense obligations" taken from the definitions of the words "mandated," "expense," and "obligations" from the online version of the Merriam-Webster Dictionary—obligations to have officially required expense.

52. Apart from characterizing Defendant's interpretation as "self-serving" and attacking Defendant's distinction between the Compensation Support Grant and the Fixed Costs and Families Grants as "fallacious," Plaintiffs' only argument against Defendant's interpretation of "mandated expense obligations" is that the ARPA makes no distinction between the two types of grants and both should be treated as having mandate expense obligations.[57]

53. After Defendant has carried its initial burden on its motion, the question is not whether Defendant's interpretation of "mandated expense obligations" was the only permissible interpretation, but whether Plaintiffs have produced evidence from which a reasonable factfinder could conclude that Defendant exercised its contractually vested discretion in bad faith.

54. The Court concludes that Plaintiffs have not met that burden. The APA granted Defendant discretion to determine the variables included in the EBITDA formula, including the interpretation of undefined terms. Defendant advanced a textually based interpretation derived from the dictionary meanings of the term "mandated expense obligations" and the structure of the Grant Funds at issue.

---

[57] (*See* Br. Resp. Def.'s MSJ 4–6.)

55. Plaintiffs' evidence demonstrates a disagreement over contract interpretation and the financial consequences of Defendant's decisions. However, under North Carolina law, disagreement with a discretionary decision does not establish bad faith. *See Lovell v. Nationwide Mut. Ins. Co.*, 108 N.C. App. 416, 421 (1993) ("[B]ad faith means 'not based on honest disagreement or innocent mistake.'" (citations omitted)). Plaintiffs have not presented credible evidence that shows Defendant exercised its discretion arbitrarily, dishonestly, or for the purpose of evading letter or the spirit of the APA.

56. Therefore, the Court concludes that there is not a genuine issue of material fact as to whether Defendant abused its discretion or breached the implied covenant of good faith and fair dealing by its interpretation of "mandated expense obligations."

57. The Court concludes that Defendant is entitled to summary judgment on Plaintiffs' breach of contract claim.

## B. Claim for Breach of Duty of Good Faith and Fair Dealing and Claim for Declaratory Judgment

58. Plaintiffs further claim that Defendant breached the duty of good faith and fair dealing imposed by § 9.7 of the APA by failing to act in good faith to maximize EBITDA and the Contingent Payment to be received by Plaintiffs.[58]

59. Plaintiffs also seek a declaration that (a) the Grant Funds are not free from mandated expense obligations by the grantor or administrator of such funds during the Earn Out Period, and that (b) the Grant Funds are to be included as recurring

---

[58] (Verified Compl. ¶ 84.)

revenue for purposes of the EBITDA calculation, the Contingent Payment and other relevant calculations.[59]

60. To the extent that Plaintiffs argue that Defendant breached its duty of good faith by failing to use commercially reasonable efforts to operate the acquired childcare centers, Plaintiffs have conceded during depositions that Defendant used reasonable commercial efforts and operated the centers in good faith.[60]

61. Plaintiffs' claim of breach of duty of good faith and fair dealing in connection with Defendant's interpretation of "mandated expense obligations" and categorization of the Fixed Costs and Families Grants as Non-Recurring Revenue is premised upon the same facts, evidence, and arguments underlying the breach of contract claim as discussed above.

62. Under North Carolina law, "where a party's claim for breach of the implied covenant of good faith and fair dealing is based on the same acts as its claim for breach of contract, we treat the former as part and parcel of the latter." *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38–39 (2018). "North Carolina state court decisions considering good faith and fair dealing claims that are 'part and parcel' of breach of contract claims . . . have concluded that the two claims merely stand or fall together[.]" *Southeast Anesthesiology Consultants, PLLC v. Rose*, 2019 NCBC LEXIS 52, at *23 (N.C. Super. Ct. Aug. 20, 2019). Since Plaintiffs' claim for breach of duty of good faith and fair dealing is based on the same alleged facts as its claim for breach

---

[59] (Verified Compl. ¶¶ 94–95.)

[60] (*See* Ex. 5- Kevin R. Campbell Dep. Tr., at 153:4–11, 151:18–20, ECF No. 41.5.)

of contract, the Court grants Defendant's Motion as to this claim to the same extent as Plaintiffs' breach of contract claim. Because Plaintiffs have failed to raise a genuine issue of material fact as to their breach of contract claim, Plaintiffs' claim of breach of duty of good faith and fair dealing likewise fails as a matter of law.

63. Courts have the statutory discretion to "refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding," N.C.G.S. § 1-257, especially "when the request for declaratory relief is duplicative of a substantive cause of action that the court will already address." *Meridian Renewable Energy LLC v. Birch Creek Dev., LLC*, 2025 NCBC LEXIS 172, at *8–9 (N.C. Super. Ct. Dec. 29, 2025) (dismissing request for declaratory relief that were largely duplicative of the breach of contract, quasi contract, and tort claims); *see also Oak Grove Techs., LLC v. Seventh Dimension, LLC*, 2025 NCBC LEXIS 111, at *29–30 (N.C. Super. Ct. Aug. 22, 2025) (dismissing, in part, declaratory judgment request that was duplicative of a breach of contract cause of action that was also dismissed).

64. Since Plaintiffs' claim for declaratory judgment is premised upon the same facts, evidence, and arguments underlying the breach of contract claim, Plaintiffs' claim for declaratory judgment also fails as a matter of law.

65. Accordingly, Defendant is also entitled to summary judgment on Plaintiffs' claim of breach of duty of good faith and fair dealing and claim for declaratory relief.

<u>Plaintiffs' Motion</u>

66.     Given that Plaintiffs' Motion for Summary Judgment is based on the same claims, arguments, and evidentiary record,[61] the Court denies Plaintiffs' Motion in its entirety.

67.     The Court's denial of Plaintiffs' Motion is further supported by the fact that the burden is heightened for an affirmative motion for summary judgment on the party's own claims, and Plaintiffs have failed to meet their burden.

**IV.**

**CONCLUSION**

68.     **WHEREFORE**, the Court hereby **GRANTS** Defendant's Motion and **DENIES** Plaintiffs' Motion.


        **SO ORDERED**, this the 6th day of February 2026.


                                        /s/ A. Todd Brown
                                        A. Todd Brown
                                        Special Superior Court Judge
                                         for Complex Business Cases

---

[61] (*See* Br. Supp. Pls.' MSJ.)